

U.S. DISTRICT COURT

DISTRICT OF MARYLAND

12/20/2021

CLERK'S OFFICE

AT BALTIMORE

BY O.L., DEPUTY CLERK

STEVEN L. JOFFE, M. D.
1 SMETON PLACE UNIT 307
TOWSON, MD 21204

## IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **STEVEN L. JOFFE, M. D.** | |
| **1 SMETON PLACE UNIT 307** | * **1. VIOLATION OF PUBLIC TRUST** |
| **TOWSON, MD 21204** | * **2. VIOLATION OF PERSONAL TRUST** |
| | * **3. THREAT TO NATIONAL SECURITY** |
| | * **4. THREAT TO PERSONAL SECURITY** |
| *pro se plaintiff* | * **5. INTENTIONAL INFLICTION OF EMOTIONAL PAIN AND SUFFERING** |
| | * **6. JURY TRIAL DEMANDED** |
| | * |
| v. | * **CASE NO.:** |
| | * |
| **VERIZON WIRELESS INC.** | * |
| **1095 AVENUE OF THE AMERICAS** | * |
| **NEW YORK,  NY 10036,** | * |
| **AND,** | * |
| **RONAN DUNN** | * |
| **EXECUTIVE VICE PRESIDENT** | * |
| **AND CHIEF OPERATING OFFICER,** | * |

**VERIZON CONSUMMER GROUP**          *

**NEW YORK, NY, USA**                *

                                     *

    *defendants*                     *

                                     *

**SERVE ON VERIZON VSAT (VERIZON**   *

**SECURITY ASSISTANCE TEAM)**        *

**180 WASHINGTON VALLEY ROAD**       *

**BEDMINSTER, NJ 07921**             *

*   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *


## TABLE OF CONTENTS

|                                                                           | Page |
|---------------------------------------------------------------------------|------|
| Introduction                                                              | 2    |
| Parties                                                                   | 3    |
| Jurisdiction                                                              | 4    |
| Venue                                                                     | 4    |
| Wide spread evidence that Verizon Wireless Inc. should be characterize as a public utility. | 5 |
| Facts                                                                     | 40   |
| Violation of public trust                                                 | 53   |
| Violation of personal  trust                                             | 56   |
| Summary                                                                   | 60   |

2

Intentional infliction of emotional pain and suffering          57

Damages          59

## INTRODUCTION

1.  This complaint arises from an attempt by the Steven L. Joffe,, M. D. (hereinafter

to be referred to as THE PLAINTIFF) to switch wireless cell phone services from

Verizon Wireless Inc. (hereinafter to be referred to as THE DEFENDANT) TO Mint

Mobile Inc. (hereinafter to be referred to as MINT MOBILE). This was, strictly, a

financial decision, and was, ostensibly a simple technical operation. It involved

removing THE DEFENDANT'S SIM (subscriber identification module) card and

replacing it with a SIM card that was proprietary to MINT MOBILE and then

following a few simple instruction. The procedure was not successful. THE

PLAINTIFF then reinserted THE DEFENDANT'S SIM card. At this juncture, THE

PLAINTIFF discovered that he had no cell service whatsoever. The numbered

complaints above are not stand alone concepts, and share some feature in common.

## PARTIES

2.  Steven L. Joffe, M.D. , THE PLAINTIFF, is a retired Emergency Medicine Physician

who currently, and at all times relevant hereto, was a resident of Baltimore County,

3

Maryland, residing specifically at 1 Smeton Place, Unit 307, Towson, MD, 21204

3. Verizon Wireless Inc.. THE DEFENDANT, is a wireless carrier service providing wireless service to millions of customers world wide, whose corporate headquarters are currently, and at all times relevant hereto, were located at 1095 Avenue of the America, New York, NY, 10036

4. Ronan Dunn is designated as Executive Vice President and Chief Operating Officer of Verizon Communication Group. His profile locates him in New York, NY. However, his specific address is not listed. He will be referred to hereinafter as THE CO-DEFENDANT

## JURISCICTION

5. THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND has jurisdiction to hear this case, as this case qualifies for diversity jurisdiction being that the parties reside in different states, and the amount in controversy exceeds $75,000.

## VENUE

6. THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND is the proper venue for this case because at least one of the parties is a resident of

4

Maryland, Furthermore, all of the alleged transgressions that form the basis of this

complaint occurred in the State of Maryland.

### WIDE SPREAD EVIDENCE THAT VERIZON WIRELESS INC.

### SHOULD BE CHARACTORIZED AS PUBLIC UTILITY

7.

Posted on December 23, 2020 by pmg

# AT&T, Verizon & CenturyLink are State Public Telecom Utilities

By Bruce Kushnick, Dec 23, 2020 | Original Medium article here.

### Forget Big Tech: Break Up Big Telecom, then Big Cable.

While the "FTC" ("Federal Trade Commission") and Attorney General offices around the US are actively going after Facebook, and there are other cases against Amazon or Google, claiming they are "Big Tech" and harming America, all of these services ride on the wires or airwaves that are mostly controlled by just a few companies: **"Big Telecom" — AT&T, Verizon & CenturyLink, and "Big Cable" — Comcast & Charter.**

Going after Big Telecom is a challenge because industry lawyers and lobbyists have rewritten history and blanketed the place with fiction. Truth be told, there is a disconnect between myth and reality about their telecommunications and cable services.

Many people are calling to make the Telcom's broadband infrastructure a utility. **It already is** and has been hiding there in plain sight.

1. Every state still has a primary regulated State Public Telecom Utility (SPTU).
2. The copper and fiber optic wires, for the most part, are owned and operated by these SPTUs, yet few are aware of these key facts.
3. These wires and the SPTU laws/regulations were not just about 'voice' calls but also about broadband, internet, data, video and gaming.
4. Since the early 1990's, SPTU landline customers have paid (and continue to pay) additional charges ($5-7 per month) on their SPTU phone bills to fund fiber optic for wired broadband which was supposed to have replaced the aging copper wires.
5. The SPTU utilities never completed these network upgrades.

6. Most Wireless service is 95% wired — only the last 5% is Wireless.
7. Wireless broadband and Wireline broadband are **NOT** "functionally equivalent services," per the 1996 Telecommunications Act (1996-Act) and Conference Report.

*1996-Act Conference Report:*

"When utilizing the term ''functionally equivalent services'' the conferees are referring only to personal wireless services as defined in this section that directly compete against one another."

**AT&T, Verizon and CenturyLink**— control the primary, critical wires, the infrastructure of most of the US, upon which all "personal wireless service" depends. Since Wireless requires fiber optic wires, the SPTU Wireline construction budgets that should have been used to upgrade America's SPTU public Wireline networks, were, instead, diverted to build out Telecoms' private Wireless networks. The SPTU Wireline construction money was also spent on everything from overseas investments to buying media or social media companies.

This has resulted in Big Telecom's control over all telecommunications and broadband prices in America and in:

- **overcharging** for wireless and wireline phone services and cable tv services, as the companies never showed up to compete for high-speed broadband.
- **creating** the Digital Divide and Net Neutrality problems
- **controlling** — by Big Telecom — who gets service and at what speeds, and so Big Telecom can prioritize their own services over others.

Worse, when you realize that all of the wires — for phone, but also data services, DSL, VOIP, FiOS, U-Verse, backhaul, and Business Data Services (special access), are all **still using the SPTU Wireline networks** and all are part of the utility but have been 'hidden from view'. In addition, the services, listed above, aren't paying market prices, or most of their expenses have been diverted to be charged to local phone customers. All of this has made these SPTU networks appear unprofitable.

These maneuvers have been used to influence policy decisions, to get new deregulatory perks or more government subsidies — or to not build out the networks in rural areas or inner cities; it was used to raise rates, get tax benefits and cut staff, while making wireless and the other lines of business appear exceptionally profitable.

Big Telecom has been able to manipulate the FCC cost accounting rules and formulas that allocate expenses in order to cross-subsidize from public Wireline networks to private Wireless networks. That is against the 1996 Telecommunications Act's **Section 254(k) Subsidy of competitive services prohibited**:

"A telecommunications carrier **may not** use services that are not competitive to **subsidize services that are subject to competition.** The Commission, with respect to interstate services, and the States, with respect to

intrastate services, **shall establish** any necessary cost allocation rules, **accounting safeguards**, and guidelines to ensure that services included in the definition of universal service bear no more than are and they are now adjusted to have the majority of all expenses go into one category, Local Service, while all of the other services using the networks are paying a fraction of these expenses."

6

And while this article has focused on Big Telecom, there have been no significant audits of the cable companies and it appears that their accounting has the same structural flaws.

If we are really going to solve the Digital Divide, lower prices and bring in competition, then cities, states, politicians and government officials all have to** start investigations** of this financial scandal and **halt the cross-subsidies** that have become accepted, and then — **Break up Big Telecom and Big Cable**.

For a simple view of what happened, see our video: *Aunt Ethel Explains the Telco Accounting Scandal that Caused the Digital Divide* — Halting the billions in subsidies caused by the accounting can pay for a fiber optic future and solve the Digital Divide.

## Every State Still has a State Public Telecom Utility — Hidden, Yet in Plain Sight

In every conversation, virtually no one knows that there are still State Public Telecom Utilitoes (SPUTs). Even the California Public Utility Commission **leaves out the basic "U" word** in recent proceedings, as does the FCC in every proceeding.

But the laws in California and in almost every state, make it clear that** the wires are part of the utility covered by utility laws**.

## CALIFORNIA

- "DIVISION 1. REGULATION OF PUBLIC UTILITIES 201–3297 *(Division 1 enacted by Stats. 1951, Ch. 764.)*
- PART 1. PUBLIC UTILITIES ACT [201–2120] *(Part 1 enacted by Stats. 1951, Ch. 764.)*
- ARTICLE 1. Specified Utilities [1001–1013] *(Article 1 enacted by Stats. 1951, Ch. 764.)*.

### § 1001:

"No railroad corporation whose railroad is operated primarily by electric energy, street railroad corporation, gas corporation, electrical corporation, telegraph corporation, telephone corporation, water corporation, or sewer system corporation shall begin the construction of a street railroad, or of a line, plant, or system, or of any extension thereof, without having first obtained from the commission a certificate that the present or future public convenience and necessity require or will require such construction. **If any public utility, in constructing or extending its line, plant, or system, interferes or is about to interfere with the operation of the line, plant, or system of any other public utility or of the water system of a public agency, already constructed, the commission…**"

Many of the laws were solidified in the Communications Act of 1934. The **Telecom companies got a franchise** for the wired services in the Public Right of Way (PROW) in every state, and almost all of America was wired — rural, urban and suburban areas — by the end of the 1960's with a copper wire, the original standard wire for America's telecommunications infrastructure.

**AT&T, for example, controls 21 state utilities and yet AT&T never mentions that these utilities exist**. And, we are talking about companies that have billions of dollars in revenues per state. In NY, the Verizon-NY Annual Report for the last 5 years showed annual revenues of $5 billion, with an additional estimated $7–10 billion in annual revenues from Verizon Wireless and other Verizon businesses in New York that are

7

not on these books, but most are using these SPTU Wireline networks. The last data for AT&T California by the FCC showed over $10 billion in annual revenues — which is NOT all of the revenue in the state going to AT&T, so it **could have as much as another $20 billion in annual revenues**.

And this brings up the most serious question — why did these companies let their state-based infrastructure deteriorate to such an extent, as documented by the <u>Communications Workers of America</u> and others?

## The Copper and Fiber Optic Wires Are Part of the State Public Telecom Utilities

**Verizon's fiber optic deployments for FiOS are done as "Title II", Common Carrier networks and part of the State Public Telecom Utility**

In 2014, we filed with the FCC that all of the Verizon fiber optic networks are Title II and part of the state utility. This quote is from the **<u>Verizon NJ FiOS franchise</u>** which was supposed to cover 95% of the state.

"The construction of Verizon NJ's fiber-to-the-premises FTTP network (the FTTP network) is being performed under the authority of Title II of the Communications Act of 1934 and under the appropriate state... As such any construction being performed in the public rights of way is being undertaken pursuant to Verizon NJ authority as a telecommunication service provider."

The "Title II" part is very controversial because <u>Verizon talked out of both sides of its mouth</u>. To the States it claims that these fiber optic wires are part of the state utility as Title II — this way Verizon could charge these networks to local phone customers and the utility.

But, at the same time, Verizon claims that these exact same wires are "Title I" because they are broadband and based on Internet Protocol (IP), making them an "Information Service".

- "Title II" is like a road — everyone should be able to use it.
- "Title I" is private property and was used to block competition.

So, the FTTP, fiber to the premises, is Title II and part of the SPTU in every state.

## The State Deregulations Were to Replace the Copper with Fiber to Deliver ALL Services, Not Just Voice Services Over the Copper, But Video and Data.

The state utility networks, sometimes called the "PSTN", "Public Switched Telephone Networks", **were always designed to cover ALL services, which includes broadband and video services**.

This is a quote from the Order by the New Jersey Board of Public Utilities granting New Jersey Bell (now Verizon New Jersey) "Alternative Regulations" in 1992. Dubbed "Opportunity New Jersey", this was supposed to transform the existing utility networks to broadband — and in this case, fiber optic broadband.

"NJ BELL'S PLAN FOR AN ALTERNATIVE FORM OF REGULATION MAY 21, 1992 — NJ Bell's plan declares that its approval by the Board would provide the foundation for acceleration of an

information age network in New Jersey and was referred to by NJ Bell as 'Opportunity New Jersey'... Opportunity New Jersey would ...accelerate the transformation of NJ Bell's public switched network,

8

which today transports voiceband services (voice, facsimile and low-speed data), to a public switched network, which transports video and high-speed data services in addition to voiceband services."

## The Information Superhighway Craze

Forget about the feeding frenzy over '5G wireless'. In 1991, the Clinton-Gore presidential ticket announced the "Information Superhighway", a plan to rewire America by replacing the existing copper wires, (which could have been put in the ground or on the poles since the 1920's), with a fiber optic wire that could handle video and thus provide competition to the wired cable TV companies.

Starting in 1991, throughout America, what is now AT&T, Verizon and CenturyLink went state to state to get laws changed, just like this example in New Jersey, to convince the state utility commissions and legislatures that they were going to upgrade their existing copper networks with fiber optics — and that if laws were changed to give the company more profits, it would replace the existing copper wired with fiber optics.

New Jersey was one of the first to accept this type of alternative regulation plan, but almost every state had the same proceedings. (There were previous plans for an earlier broadband technology, ISDN, that used the copper networks. It was eventually given an apt nickname: "It Still Does Nothing".)

## Customers Paid for a Fiber Optic Wired Broadband Future — Which Was a Replacement of the Copper Wires as Part of the State Public Telecom Utility

In Connecticut, Southern New England Telephone, SNET, was not officially one of the original 'Bell companies", but it covers most of Connecticut. In their 1996 Annual Report, SNET laid out a plan called "I-SNET" — a statewide upgrade, REPLACING the existing copper wire with fiber optic wires for broadband and video — ALL SERVICES over a fiber optic wire. And it would spend $4.5 billion and be completed in 2007.

"I-SNET: According to the 1996 Annual Report:

"I-SNET is . . . a statewide telephony and information superhighway. Since 1994, the wireline business has been replacing its existing network of twisted copper wire with low maintenance fiber-optic and coaxial cable. The buildout of I-SNET, a $4.5 billion investment, is expected to be completed by 2007. This advanced network is capable of delivering voice, video and a full range of information and interactive multimedia services. I-SNET passed approximately 234,000 households as of December 1996, and is expected to pass approximately 334,000 households by December 1997. The support of this investment will be primarily through increased productivity from the new technology deployed and customer demand for the new services offered."

And, as the next paragraph continues, this deregulation established "price caps", where the price of basic services, defined as "Non-competitive", was not increased for a few years, but the "Competitive" services allowed the profits to increase immediately. This included calling features, like Call Waiting or Caller ID, which are separate charges on wireline services, that range from $4.00-$9.00 per service per month, yet

Call Waiting cost less than 1 penny to offer while Caller ID is under $.25 cents. And again, this was based on a commitment to do fiber optics as part of the state utility, replacing the existing copper wires — and the profits on calling features, etc. were allowed to be increased, with the assumption it was for new construction.

"In March 1996, the DPUC (State Public Utility Commission) issued a final decision that replaces traditional rate of return regulation with alternative (price based) regulation to be employed, effective April 1, 1996, during the transition to full competition. The decision contains the following major items: price cap regulation for non-competitive services; a five year monitoring period on financial results; and a price cap formula on services categorized as non-competitive (utilizing an inflation factor, a 5% productivity offset, a narrowly defined exogenous factor, a potential service quality adjustment and various pricing bands). In addition, basic local service rates for residence, business and coin may not be raised above

current levels until January 1, 1998, at which time the price cap formula becomes effective for these services, unless they have been reclassified into the emerging competitive or competitive categories.."

Sorry for the telecom-jargon, but simply put, almost every state had changes in their state regulations to grant deregulation, i.e., price caps, to the companies for this fiber optic future. **In CT, after the law passed, in a decade+, dividend payments doubled, and there was a drop of 60% in staff.**

We filed a complaint with the Connecticut Attorney General's Office in 2009 about the failure to roll out the networks and about the the merger with AT&T that shuttered any fiber networks that were being rolled out. And it's been downhill in CT from there, with the sale to Frontier.

**NO COMPANY BUILT OUT THE FIBER NETWORKS AS STATED, BUT THEY STILL GOT PAID.**

**NO STATE WENT BACK AND GOT REFUNDS OR LOWERED RATES OR ERASED THE LAWS\*\* — some did try, however.**

We wrote a trilogy of books to document these bait-and-switch deals. The latest: "The Book of Broken Promises: $400 Billion Broadband Scandal and Free the Net"

## The State Public Telecom Utilities and Network Upgrades Are Not a History Lesson But Are Current To-Dos.

What we just discussed is not history but has current, real-world consequences as every state is now attempting to solve the Digital Divide problems that have been exposed by the so-called pandemic and most are just throwing money at it, with the same terrible results. But, it is time to recognize that there are still SPTUs and that they are not just for voice calls but all services, including broadband.

Take the situation in Minnesota, for example. A complaint dated October 20th, 2020 by the Communications Workers of America (CWA) against CenturyLink, discusses that there have been staff cuts and that

1.  these are utility networks
2.  they are not just for voice services and
3.  the law itself calls for continuous upgrading of the networks for video and data services.

The CWA Letter details that there is specific language discussing that the telephone company, CenturyLink, is a telephone utility

"**7810.3300 MAINTENANCE OF PLANT AND EQUIPMENT.** Each telephone utility shall adopt and pursue a maintenance program aimed at achieving efficient operation of its system so as to permit the rendering of safe and adequate service. Maintenance shall include keeping all plant and equipment in good state of repair consistent with safety and adequate service performance. Broken, damaged, or deteriorated parts which are no longer serviceable shall be repaired or replaced. Adjustable apparatus and equipment shall be readjusted as necessary when found by preventive routines or fault location tests to be in unsatisfactory operating condition."

Moreover, the utility networks are not just for copper-based phone service. **The state laws are supposed to be encouraging an upgrade to "higher speed telecommunications"**; this means that the entire copper

networks should have been upgrading to fiber to offer, not only voice services, but high-speed connections for data and video services — for years.

"In addition, Minn. Stat. § 237.011 provides the State goals the Commission should consider as it executes its regulatory duties with respect to telecommunications services, including "(3) encouraging economically efficient deployment of infrastructure for higher speed telecommunication services and greater capacity for voice, video, and data transmission.

As the Commission executes its regulatory duty to ensure CenturyLink maintains adequate staffing levels for telecommunications service, since the same technicians are used for both telephone and internet installations, maintenance, and repair, the Commission will be helping to achieve this statutory goal."

In the next series of articles we will also address the most important issue — that the companies have been able to manipulate the FCC cost accounting rules and formulas to make the entire US wired infrastructure appear unprofitable — causing the Digital Divide.

- Link to Overcharged America: Solve the Digital Divide by Halting Billions in Cross-Subsidies — What Happened in Your State?

For those of you who claim that you want a broadband utility and funds to pay for upgrades and solving the Digital Divide — this is a call to action. State legislatures, public utility commissions, cities and Attorney Generals' offices, need to **start audits and investigations of the Big Telecom** so the states can clawback the public utilities and halt the overcharges to local service subscribers, as well **halt the cross-subsidies** so that these funds can be used to complete the build out of universal access services that are high-speed and **symmetrical to all homes, businesses and institutions**. This will also lower prices through competition and choice.

We've laid out a roadmap that we filed as part of comments with the California Broadband Council about Governor Newsom's broadband executive order.

**Share this:**

- Click to share on Twitter (Opens in new window)
- Click to share on Facebook (Opens in new window)

tists For Wired Technology
Sausalito, CA

**Complete this email form**

Name(required)

Email(required)



1. Please type your message here (optional)

# About This Site

**Scientists For Wired Technology** is a member organization that seeks to make effective, lasting changes to federal, state and local laws, regulations and practices that will protect people of all ages, and all living organisms from the hazards of continuous exposures to pulsed, data-modulated, Radio-frequency Electromagnetic Microwave Radiation (RF-EMR), which is a manmade, toxic agent that causes systemic biological damages at levels many thousands of times lower than current U.S. RF-EMR radiation exposure guidelines. Learn more.

13

# Search

Search for: 

© 2017-2021 Scientists For Wired Technology. All rights reserved. | *Disclaimer*

Proudly powered by WordPress

8.   Mar 17, 2015, 04:10pm EDS

# 7.   Here's Why Verizon Should Embrace Being A Utility

Rameet Chawla
Former Contributor
Tech
I write about "digital innovation."
This article is more than 6 years old.

• • So, here's the problem, Verizon: FCC Chairman Tom Wheeler recently proposed rules that would classify the fastest-growing and most profitable part of your business as a utility. More precisely, he proposed regulating both wired and wireless Internet data service as a "common carrier" under Title II of the Communications Act of 1934. There will be a period of public comment and then a vote, but these regulations are likely to happen. Both wired and wireless Internet access are going to join the regulatory ranks of landline phone service. And because this is at the heart of what you do, you're about to become even more of a utility company.

**Step One: Admit It**

You have brightly lit consumer stores. You sell shiny new gadgets. You run expensive marketing campaigns. But fundamentally, here's what you do: you deliver data. Period. Whether you're delivering voice calls, text messages, emails, emoji, GIFs, or lemur memes, it's all traveling across your network as digital data. The rest is wrapping paper, and it's time to stop charging extra for the bow.

If you want to remain one of the most popular deliverers of data, get ahead of the competition by openly admitting that's what you do: deliver data. Admit that text messages and voice calls aren't special products or features. They're just particular forms of data.

While you're at it, stop charging separately for each device of mine to which you deliver data. Let me use my data plan to connect my phone, my tablet, my personal WiFi hotspot, and whatever else I want without

14

charging me extra fees for each device. The power company doesn't charge me by the outlet, the water utility doesn't charge me by the faucet, and landline phone providers don't charge me by the handset. I understand that you may not appreciate being compared to a water utility, but the FCC's ruling is going to

make this a common comparison. Those other utilities all charge me according to what they deliver, and you should too.

PROMOTED

Yes, I realize that T-Mobile, Sprint, and AT&T are all charging separately by device, and it's a tempting way to obscure the true total cost of data delivery. But you have a chance right now to lead the way to wireless device agnosticism. Whether you lead or follow, per-device fees are on their way to obsolescence. Hardware is superseding your present device restrictions with the ability to tether devices. If you charge me extra for each device, I'm going to get all my data through one tethered device anyway. But if you're the utility that lets me use my monthly data freely on whatever device I want, I'm going to stick with you for the simplicity and flexibility you provide.

So which wireless data utility identity do you want to own? The industry leader that makes it easy for customers to stay connected across devices? Or the fee-piling provider with artificial barriers that customers have to awkwardly tether themselves around to get what they need? Or the provider that only belatedly follows the path to device agnosticism that some other provider will inevitably blaze? Your call.

**Step Two: Kill WiFi!**

Once you've gone cold turkey on the trumped up fees for certain forms of data delivery to certain devices -- which is what the principle of net neutrality is going to force you to do anyway -- you can focus on a more fundamental way to increase revenues. Deliver more value by making it easier for your customers to use more data. Make access to your data pipelines ubiquitous.

You currently sell all those iPhones and Android phones and mobile WiFi hotspots because you know people will use them to purchase and use your data pipelines. You don't care about the phone sales. You care about the data sales.

So here's what you do to sell more data: kill WiFi. Seriously, get so good at delivering data over your wireless network that WiFi networks become redundant. You already have the superior technology. Your signals travel for miles, not meters. Your signals can travel through multiple walls. And tower switching technology works really well, so I won't have to log on again each time I move to another location.

Most of your customers are currently also paying for wired Internet service through their cable provider, and then coaxing a WiFi router signal to stretch to all the corners of their house. They have two ISPs: you and their cable company. Sell your customers instead on the idea of a single ISP: you. Charge them a little more, but find the sweet spot where it will make financial sense for them to drop their cable Internet service and buy all their data service from you. For those with access to your FiOS fiber optic network, keep pushing those package deals of data, wireless and wired. For everyone else, proliferate high bandwidth data access into homes with small cells, femtocells, and anything else your engineers can dream up. Do this, and whether your customers are at home or out in the world becomes unimportant. Wherever they are, they're online through their data contract with you.

I realize that the network throughput needed to support all those Netflix customers binge-watching season three of "House of Cards" will take some time to develop. Dedicate some of your best minds to finding

15

innovative solutions to this. Will it be a straight-up upgrade of your network? An additional layer added to it for high-bandwidth activities? Creative piggybacking on your fiber-optic network? Your well deserved

reputation for quality data delivery proves that you have the innovative chops to figure out a solution. And if you do, you can make cable Internet's territory your own.

**Step 3: Hardware**

You know what part of your current business is not about to be classified a utility? The phones. The phablets. The mobile hotspots. The hardware with which people connect to your utility service. Oh sure, there are some regulations about antennas and signals. But for the most part, the hardware is still open to plenty of innovation and differentiation. And just as fancy faucet manufacturers aren't meaningfully hindered by water utility regulations, you won't be held back in device manufacturing by the regulations governing data delivery.

You already have a vast customer base and network of retail stores. Why not leverage that to sell your own phones? And not just any phones, but something innovative that will stand out from the rest.

The Android phone market is badly fragmented right now. There's an opening for you to leapfrog over the Android mess and become the first company to develop a Chrome OS phone. Chromebooks and Chromeboxes -- laptops and desktops that run on the Chrome operating system -- are already out, and I believe their market share is going to grow robustly. The obvious next step is for Chrome OS to dominate mobile devices. You can start building that future now.

Design your phones to make the most of your network, doubling as mobile WiFi hotspots and promiscuous tether points for all that data sharing your customers will be doing. You're already selling your own branded mobile WiFi device, so it's not such a leap.

The goal here is not only to enable people to use your utility data delivery service. The other manufacturers can do that perfectly well for you. The goal here is to make the hardware a real profit generator for you. That means you have to get the hardware right. But if you do, you're well positioned to be successful selling it. You already own the distribution channel!

**The Truth Will Set You Free**

Some big changes are ahead for you, Verizon, but you're well positioned to come out of this even stronger than before. Parts of your profitability have long rested on fictions and restrictions: that SMS data was somehow different from an email and that a data plan needed to be locked to a single device. Use this opportunity to develop a more honest and open revenue model, and you'll win the loyalty of your customers for a long time to come.

Rameet Chawla
I am the founder of Fueled, a mobile design and development company based in New York and London, and the Fueled Collective, a co-working space comprised of over 35 startups...

- Print
- Reprints & Permissions

16

Current Time 0:00

/
Duration 1:06

May 6, 2021,06:30am EDT|87,172 views

# 8. **Verizon FiOS Gets Benefits Of Being A Public Utility Without The Regulations**

5.28.14 5:14 PM EDT By Chris Morran@themorrancave

have your fios and eat it too verizon verizon fios fcc net neutrality tom wheeler broadband

(Photo: Damian)

As you probably know, Verizon was the company behind the lawsuit that gutted the FCC's net neutrality rules. The telecom titan successfully argued that the FCC lacked the authority to regulate broadband providers like Verizon FiOS. What was lost in this discussion is the fact that all the while Verizon was saying FiOS should not face the same level of regulation placed on landline phone service, it was enjoying all the perks of being associated with a public utility.

A quick recap for those coming late to this topic. In the stone age of the Internet, the FCC stupidly categorized broadband as a loosely regulated Title I "information service," rather than labeling it a Title II "telecommunication service," which gives the commission more regulatory authority. In 2010, the FCC established the Open Internet Rule (aka net neutrality), which stated that ISPs couldn't slow down, block, or prioritize any data based on its source, content, or destination.

This also meant that Verizon, et al, could not make money by squeezing deep-pocketed content providers for better access. The ISPs don't like not being able to nickel/dime at every opportunity, so they sued, successfully arguing to a federal appeals court that the current "information service" classification of broadband means the FCC can't enact such tough regulations.

Recently installed FCC Chair Tom Wheeler (a former frontman for both the cable and wireless industries) recently introduced his new, controversial attempt at reinstating net neutrality. It would allow ISPs to charge content providers for improved access, but it also leaves open the door to the idea of reclassifying broadband as a telecommunications service.

This hasn't gone over well with Verizon and its cronies, who are have lobbyist spreading industry-approved cow dung all over D.C., arguing that reclassifying broadband would put poor little ISPs like Verizon in a position where they couldn't do all that innovating (that they don't actually do).

17

But while Verizon is trying to convince people how important it is that broadband remain only mildly regulated, a new report [PDF] highlights some of the ways in which Verizon FiOS has benefited from perks afforded only to public utilities like landline service.

See, while Verizon FiOS, as an ISP, is considered a Title I service, Verizon's franchise deals with municipalities around the country explicitly call out Verizon's fiber-to-the-premises (FTTP) network that *carries* FiOS as a Title II service; the same as landline telephone service.

 "Verizon's New York City's current cable franchise, as well as the franchises for other Verizon franchises in other states, from DC to New Jersey — all detail that at the core of Verizon's cable, Internet, and broadband networks is a 'Title II', common carriage, telecommunications service," reads the report. "And it appears this was done for two reasons — it gets all of the powers of the utility, including the rights-of-way that are part of the telecommunications utility service, but it also may charge the copper-based POTS [plain old telephone service] utility customers for the development and deployment of FiOS."

So Verizon has been able to pay for the rollout (however slow and stalled it may be) of FiOS with the help of its landline customers, and it's claimed its authority for connecting that FiOS network to consumers' homes, under Title II. But it doesn't want the FCC treating the service that it delivers through that network to be treated that way.

None of this is illegal, and sadly it's standard practice in the cable, telecom, and wireless industries. For example, on a smartphone, the voice and texting services are Title II while your data is Title I. The cable connection coming to your house brings data (Title I) and pay-TV (Title VI) and maybe VoIP phone service, which is currently unclassified.

What it does show is the hypocrisy of these industries, as they use whichever classification provides them the most benefit, regardless of whether or not that label holds true.

"The wireless carriers are all big on using this Title II stuff when it comes to things like getting the FCC to preempt states on tower siting and… the use of phone numbers and mandatory interconnections with landline [networks] and all that good stuff," Harold Feld of Public Knowledge explains to Ars Technica.

It's been 12 years since the FCC — under the leadership of Michael "Son of Colin" Powell, who now heads the National Cable & Telecommunications Association — knuckled under to pressure from ISPs and classified broadband as Title I. Back then, one could make the argument that Internet access was not an essential utility, as in-home Internet was just beginning to take off with the growth of DSL and cable Internet.

But with the development and rapid adoption of WiFi, connected devices, tablets and smartphones, the Internet has quickly become an irreplaceable leg on which modern culture and industry stand. Just watch what happens when ISP service goes down in an office for even a short time; it's no longer, "Oh crap, I can't IM my friends Sally and Mike," but "Holy sh&$#, I can't do a single thing until access is restored because every document and application I need is accessed remotely."

Today's businesses are now just as reliant on Internet access as they are on electricity and phone service. It's time for the FCC to recognize this fact and reclassify broadband accordingly.

**Click here for more information on how to let the FCC know how you feel about net neutrality.**

Want more consumer news? Visit our parent organization, **Consumer Reports**, for the latest on scams, recalls, and other consumer issues.

5.28.14By Chris Morran@themorrancave

have your fios and eat it too verizon verizon fios fcc net neutrality tom wheeler broadband

# 9. CPUC Requires Consumer Protection Measures for Verizon's Acquisition of TracFone

November 18, 2021 -

The California Public Utilities Commission (CPUC), in ongoing efforts to ensure reliable and affordable telecommunication services, today approved Verizon Communications' acquisition of TracFone Wireless with consumer protection conditions to ensure the acquisition will be in the public interest.

The CPUC reviews proposed telecommunication mergers and acquisitions to ensure they are in the public interest. Today's Decision finds that in order for Verizon and TracFone to meet the burden of proving their acquisition is in the public interest, they must adopt a number of specific measures to protect consumers from price increases and service disruptions.

Today's Decision imposes consumer protection measures that will enhance service quality and benefits for impacted customers including those participating in the California LifeLine program, which subsidizes phone services based on income qualifications. These enhancements and protections include:

- TracFone or Verizon must participate in California LifeLine for 20 years after the close of the transaction.
- To ensure that TracFone maintains a significant level of participation in California LifeLine in future years, TracFone and Verizon must enroll at least 200,000 California LifeLine subscribers by December 31, 2025. Additionally, by December 31, 2023, at least 15 percent of California LifeLine subscribers must be in low-income disadvantaged communities.
- TracFone or Verizon must offer LifeLine customers a phone at no cost, including 5G phones after the first year of the merger, in locations where Verizon currently offers 5G retail services.
- TracFone or Verizon must offer plans with comparable voice, text, and data at the same or a lower price as TracFone currently offers for a total of five years following the close of the transaction.
- All Verizon branded stores must advertise and offer enrollment in the California LifeLine program.

In order to facilitate a smooth transition for customers, Verizon and TracFone must migrate all TracFone customers to Verizon's network within two years following the close of the acquisition, giving priority to TracFone's current California LifeLine customers at risk of having their service compromised.

19

The Decision also establishes a reporting process as well as an enforcement program to ensure compliance with the conditions ordered, with penalties if specific performance requirements are not met.

"Our Decision imposes several important consumer protection conditions, beyond what the companies proposed in their application, to ensure that low-income customers in particular benefit from the merger," said Commissioner Clifford Rechtschaffen.

"I appreciate the steps this Decision has taken to ensure that LifeLine continues to be provided to TracFone's existing customers and that Californians will have even greater access to the LifeLine program through this acquisition," said Commissioner Genevieve Shiroma.

Verizon Wireless provides nationwide voice and data services. TracFone is an indirect, wholly owned subsidiary of América Móvil that sells and distributes prepaid, no-contract wireless phones and wireless voice service. TracFone does not own its own wireless network, so it operates as a mobile virtual network operator that relies on facilities-based network providers to offer service through wholesale service agreements. Under the acquisition, TracFone will become a wholly owned direct subsidiary of Verizon. Verizon intends to migrate all TracFone customers currently using the networks of other providers (in general, AT&T and T-Mobile) to Verizon's network.

The proposal voted on is available at
https://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M423/K539/423539374.PDF.

Documents related to this proceeding are available at
https://apps.cpuc.ca.gov/apex/f?p=401:56:0::NO:RP,57,RIR:P5_PROCEEDING_SELECT:A2011001.

The CPUC regulates services and utilities, safeguards the environment, and assures Californians' access to safe and reliable utility infrastructure and services. For more information on the CPUC, please visit www.cpuc.ca.gov.

### 

Press Release

10.

**PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA**

**Communications Division RESOLUTION T-17330**

**Carrier Oversight & Programs Branch July 28, 2011**

## R E S O L U T I O N

**Resolution T-17330. Verizon California Inc. (U-1002 C) requests authority to deviate from California Public Utilities Code Section 320 along scenic Highway 395 in Mono County between Bishop and Mammoth Lakes**

**By letter dated July 10, 2008 to the Executive Director.**

---

--

## Summary

On July 10, 2008, Verizon California Inc. (Verizon) requested by letter to the Communications Director a deviation from the undergrounding requirements of Pub. Util. Code[1] Section 320 (Section 320 or § 320) which requires that all communications or electric utility facilities within 1,000 feet of a scenic highway be placed underground. Verizon is requesting this deviation for approximately 32,000 feet of fiber optic cable it has deployed along scenic Highway 395 in Mono County.

This resolution imposes a penalty on Verizon in the amount of $5,000 for violating § 320. Additionally, Verizon has submitted an application for a California Advanced Services Fund (CASF) grant to add the necessary facilities to provide broadband from this fiber deployment to the currently unserved communities of Swall Meadows and Crowley Lake. Verizon shall begin

offering broadband services from this deployment to these communities within 18 months of the approval of this resolution, regardless of the outcome of its CASF grant application. This resolution does not require Verizon to underground aerial facilities along Highway 395 in Mono County between Bishop and Mammoth Lakes.

We approve this request for deviation in accordance with Decision (D.) 80864, conditional upon Verizon paying the specified fine amount, providing broadband services to those unserved communities, and submitting a plan to the Commission to ensure ongoing compliance with regulations protecting California's Scenic Highways.

## Background

Section 320 was enacted in 1971, and reads in relevant part as follows:

The legislature hereby declares that it is the policy of this state to achieve, whenever feasible and not inconsistent with sound environmental planning, the undergrounding of all future electric and communication distribution facilities which are proposed to be erected in proximity to any highway designated a state scenic highway pursuant to Article 2.5 (commencing with Section 260) of Chapter 2 of Division 1 of the Streets and Highways Code and which would be visible from such scenic highways if erected above ground. The Commission shall prepare and adopt by December 31, 1972, a statewide plan and schedule for the undergrounding of all such utility distribution facilities in accordance with the aforesaid policy and the rules of the Commission relating to the undergrounding of facilities. The Commission shall require compliance with the plan upon its adoption.

The Commission is responsible for the administration of § 320. After hearings were conducted in Case 9364, the Commission, through state legislation, implemented D.80864, which states:

21

í

In order to facilitate administration, letter requests for deviations[2] will be accepted, reviewed by the Commission staff and, where appropriate, approved by Commission resolution[3].

D.80864 held that no communications or electric utility shall install overhead distribution facilities "in proximity to" and "visible from" any prescribed corridor on a designated scenic highway in California unless a showing is made before the Commission and a finding made by the Commission that undergrounding would not be feasible or would be inconsistent with sound environmental planning. This Decision also defines "in proximity to" as being within 1,000 feet from either edge of the right-of-way of a designated state scenic highway.

D.80864 further stipulates that when repairs or replacement of existing overhead facilities in the same location do not significantly alter the visual impact of the Scenic Highway, they should not be considered as new construction and need not be converted to underground.

**Notice/Protests**

This letter did not appear in the Commission's Daily Calendar because it was never filed as an Advice Letter or other formal document.

On November 23, 2009, Stephen Kalish, a resident of Mono County, filed a protest to Verizon's request for deviation asking the Commission to deny the request and require Verizon to underground the telecommunications facilities.

On December 2, 2009, Verizon responded to Mr. Kalish's protest by stating that all information had been provided and the relief requested is consistent with law and with Commission precedent.

**Comments**

In compliance with § 311(g), a notice letter was emailed on July 28, 2011, informing the interested parties of the availability of the draft of this Resolution for public comments at the Commission's website http://www.cpuc.ca.gov. This letter also informed parties that the final Resolution adopted by the Commission will be posted and will be available at the same website.

Verizon and the Board of Supervisors County of Mono, submitted Opening Comments on July 12, 2011 in support of the draft resolution. Reply comments were filed on July 18 by the Board of Supervisors County of Mono, and Stephen Kalish, a resident of the Swall Meadows community in support of the draft resolution. However, all parties voiced concern regarding the proposed resolution's Ordering Paragraph 3, which requires Verizon to construct facilities to extend broadband service to Swall Meadows and Crowley Lakes.

In its Opening Comments, Verizon requests the elimination of Ordering Paragraph 3, Ordering Paragraph 3 had directed Verizon to apply for a CASF grant for this service extension. Verizon has since submitted this application on July 12, 2011. The Commission agrees that the portion of Ordering Paragraph 3 relating to the submission of this application is now moot, and thus has removed that portion of the requirement.

In its Reply Comments, the County expresses support for Ordering Paragraph 3 and recommends adding an additional component requiring Verizon to complete its extensions to Swall Meadows and Crowley Lakes within one year. The Commission finds this recommendation reasonable but will require completion in 18 months, consistent with the project deployment

schedule submitted by Verizon in its CASF grant application.

Stephen Kalish filed Reply Comments in response to Verizon's Opening Comments. Mr. Kalish emphasized the importance of Ordering Paragraph 3, and suggests further strengthening the requirement to include a completion deadline, and adhere to the CASF benchmarks for bandwidth. Mr. Kalish further suggests that the Ordering Paragraph language clarify that Verizon be required to provision these extensions regardless of the approval of their CASF application.

While the Commission does not deny that more robust data transmission speeds would be preferable, no transmission speed requirement will be implemented other than those that will be required if Verizon receives a CASF grant.

**Discussion**

The Commission has evaluated this deviation request considering the following factors (1) the nature of the project; (2) local government recommendation; (3) visibility, aesthetics, environmental impact; and (4) economic feasibility. Our conclusion here is based on tangible evidence and analysis of these factors.

Nature of the Project

Verizon constructed a fiber optic trunkline consisting of a single 96-pair fiber-optic cable, black in color and less than one inch in diameter, deployed from Mammoth Lakes in Mono County to Bishop in Inyo County. Verizon began construction of this project in 2001, through the use of joint pole attachments to existing Southern California Edison (SCE) electric transmission and distribution poles.

The construction of the fiber optic trunkline increases broadband service capabilities to Verizon customers in Mammoth Lakes, which had previously exhausted its high bandwidth capacity and was therefore prohibited from providing service to new customers.

This project increases accessibility of advanced services such as DSL broadband to customers in Mammoth Lakes and communities northward, including June Lake, Lee Vining, and Bridgeport. However, the new broadband line will not serve the communities located along the right-of-way south of Mammoth Lakes. These customers were passed by the new line but are not afforded access to broadband services.

Swall Meadows and Crowley Lakes are the two largest communities to the south of Mammoth Lakes which are passed by the facilities yet remain unserved, and for which Verizon originally had no plans to provide broadband services.

A group of citizens from Swall Meadows contacted the Commission in 2008, requesting enforcement of § 320 along Highway 395, a designated scenic corridor. After investigation, the Commission found that Verizon did violate the Public Utilities Code and as a result directed Verizon to apply for a § 320 deviation if it did not wish to underground the facilities in question.

Local Government Recommendation

On September 10, 2008, the Commission held a public meeting in Mammoth Lakes, seeking

input on the project. Stakeholders were invited to voice their concerns regarding the § 320 exemption request and impact of the project. There were approximately 30 attendees[4] who

expressed opinions on a variety issues, including potential fire and avalanche danger, visual impact in winter as compared to summer conditions, the cumulative visual impact of additional facilities on the scenic highway area, and whether undergrounding is feasible given the geology of the area. Commission staff investigated these concerns, and any pertinent information resulting from this investigation is included in this resolution.

The City of Mammoth Lakes and several representatives of Mono County expressed support for the project at the public meeting. Additionally, during the second half of 2008, these parties periodically encouraged the CPUC to grant this request for deviation through telephone calls, letters and e-mails. Mammoth Lakes has an increasing population, as well as a growing tourism industry that is the area's main economic engine. Increasing tourism brings additional demand for advanced communications services as tourists have come to expect broadband access along with other standard amenities.

In comments, the Board of Supervisors County of Mono expressed support for the Commission's proposal and emphasized the County's great need for broadband facilities. The County further expressed that these long awaited services are vital for the public safety and economic viability of the communities in the County

Visibility, Aesthetics and Environmental Impact

In September 2008, CD staff toured the entirety of the project from Mammoth Lakes to Bishop. During this tour, CD staff documented current conditions, visual impact, existing facilities and area terrain, with an understanding that the intent of § 320 is to preserve California's natural beauty by limiting aerial deployment in scenic areas.

The right-of-way for this deployment runs through lands controlled by the USFS, Los Angeles Department of Water and Power, Bureau of Land Management, CalTrans, and private citizens.

Highway 395 is a high-altitude road passing rugged mountains and salt-flat lakes. Scenery here is typical of high desert meadows with peaks of the Sierra Nevada range to the west. The area is dry with rocky terrain and is sparsely populated with few sections of residential development between the cities of Mammoth Lakes and Bishop.

As noted above, these facilities are on existing SCE poles. These long-range electric transmission and distribution lines are substantial and significantly impact the aesthetic value of the scenic highway corridor. This was evidenced by CD staff on a site visit to the facilities in September 2008.

24

In addition to its fiber cable, Verizon also has existing underground copper trunk facilities between Mammoth Lakes and the Crowley Lake central office placed in 1974. Verizon asserts that it did not explore utilizing these existing easements due to construction costs and the need for environmental studies.

This project added a single 96-pair fiber-optic cable, less than one inch in diameter, black in color to the visible facilities along 32,000 feet of Highway 395. Some sections also include metal coiling along the cable for approximately two feet on either side of a pole attachment. Although these facilities are visible from the scenic highway, they do not significantly add to the cumulative aesthetic impact of the previously existing electric transmission towers and lines deployed along the aforementioned sections of Highway 395.

Based on a review of the project file, the status of the project, and recent analysis, the USFS issued a decision on September 30, 2008, wherein it was determined that there were no direct or indirect effects from the proposed project on botany, wildlife or heritage resources as a result of the installation.

Economic Feasibility

Verizon estimates a cost ratio of 5:1 between the installation of underground and overhead lines.

| Verizon Fiber Optic Facilities Cost: Highway 395, Mono County | |
|---|---|
| Deviation Requested (Overhead) | $104,000 |
| § 320 Requirement (Underground) | $522,000 |
| Cost Differential | $418,000 |
| Underground to Overhead Ratio | 5:1 |

The Commission finds that this cost disparity may make undergrounding not economically feasible. Additionally this cost ratio is similar to requests for exemption from § 320 which were previously approved.

**Violation of the Public Utilities Code, Fines and Remediation**

Violations of Public Utilities Code can result in the imposition of fines. In D.98-12-075, the Commission concluded that "...disregarding a statutory or Commission directive, regardless of the effects on the public, will be accorded a high level of severity". P.U. Code 702 states: "Every public utility shall obey and comply with every order, decision, direction, or rule made or prescribed by the commission in the matters specified in this part, or any other matter in any way relating to or affecting its business as a public utility, and shall do anything necessary or proper to secure compliance therewith by all of its officers, agents, and employees."

Verizon did break the law by not complying with § 320 when it constructed facilities along scenic Highway 395 in Mono and Inyo Counties, although the factors discussed above favor the placement of overhead cables instead of underground. Therefore the Commission approves this deviation from § 320, but with the stipulation that Verizon pay a fine to the State of California in the amount of $5,000 for failure to comply with § 320 before constructing these facilities, and for failure to attempt to remedy this violation.

Project Specific Remediation Efforts

The Commission suggested remediation possibilities for Verizon, including an option for Verizon to provide benefit to those customers affected by this deployment by offering broadband service to those unserved residents between Mammoth Lakes and Bishop. A letter from residents organized as the Concerned Residents of Swall Meadows dated April 2, 2008 states that Verizon service upgrades for communities north of Bishop and south of Mammoth Lakes is one desired outcome of this resolution.

Verizon estimated the cost of providing broadband services to the residents of Swall Meadows and Crowley Lake to be $693,000. Verizon has applied for a CASF grant, which is specifically designated for projects to build and extend internet and broadband connections to unserved and underserved areas. If approved, Verizon may receive up to 40% of the project cost. We will consider the merits of that application after Commission staff has completed its review

Remediation Efforts for Future Compliance

Verizon would benefit from having a planned course of action for future proposed construction in designated state scenic highway areas protected by § 320. The purpose of the statute is to protect California's natural beauty and environment.

Verizon's non-compliance with D.80864 and § 320 is unacceptable. It is Verizon's responsibility as a regulated carrier to comply with all CPUC codes and regulations specific to California Scenic Highways. Therefore, requiring Verizon to submit a written plan for future compliance with § 320 within Verizon's territory is appropriate. CD proposes two specific remediations directed at assuring future compliance and past non-compliance.

The submitted plan should contain all of the actions necessary for proposed construction of communications facilities including procedures for:

· Discerning whether proposed construction of facilities is within a Designated State Scenic Highway area.

· Obtaining permits and/or authorization from government agencies, including a list of government agencies from which permits and/or authorization would be necessary.

· Providing notification to government agencies with interest, including the Commission, and facilitation for public comment by interested parties.

· The plan should be submitted to the Commission within 60 days of this Resolution.

## Penalties for Failure to Apply for § 320 Exemption Before Construction

Verizon applied for exemption only after neighbors opposing the overhead deployment brought it to their attention, and therefore constructed these facilities in violation of the Public Utilities Code. The Commission therefore imposes a fine of $5,000 on Verizon for failure to comply with the California Public Utilities Code § 320.

In calculating a fine, the Legislature has directed the Commission to apply the penalties provided in Section 2107 in the absence of a specific penalty scheme established for similar circumstances. D.80864, which implemented § 320, did not anticipate violations and therefore did not prescribe specific penalties for violations. D.80864 states: "Other portions of the Public Utilities Act provide ample means for effecting compliance if there are any rare cases where the order herein is ignored by any respondent." Public Utilities Code Section 2107 states that penalties shall be not less than $500 nor more than $20,000 for each offense.

## Commission's Penalty Directives

Under PU Code § 2107, the Commission has regulatory authority to assess a penalty ranging from $500 to $20,000 per offense, for which a penalty has not otherwise been provided. Furthermore, PU Code § 2108 states that each day a violation continues or various parts of a project may stand as separate and distinct violations in and of themselves for the purpose of assessing fine amounts. Decision 98-12-075 serves as a guide in assessing a suitable penalty for

violations of the Commission's rules and regulations and states that "the purpose of a fine is to go beyond restitution to the victim and to effectively deter further violations by this perpetrator or others. As they apply to this case, these criteria will be considered in this analysis: 1) severity of the offense; 2) conduct of the utility; 3) financial resources of the utility; 4) totality of the circumstances; and 5) the role of precedent.

## 1. Severity of the Offense

In D.98-12-075 the Commission found that the penalty amount should be commensurate with the severity of the violation. To determine the severity of the offense the Commission may consider (a) physical harm, (b) economic harm, (c) harm to the regulatory process, and (d) the number and scope of violations.

### a. Physical Harm

Having violated § 320, enacted to preserve the natural beauty of California's Scenic Highways, Verizon's failure to seek exemption prior to construction compromised the Scenic of overhead distribution facilities along scenic highways. The submitted plan should contain all the actions necessary for the proposed construction of communications facilities including procedures for:

27

### b. Economic Harm

Verizon unlawfully constructed facilities without expending the resources to secure necessary exemptions. As these fiber optic facilities are have been and are currently in use and generating income, Verizon gained a competitive and/or operational benefit by violating § 320.

### c. Harm to the Regulatory Process

In D.98-12-075 the Commission concluded that "disregarding a statutory or Commission directive, regardless of the effects on the public, will be accorded a high level of severity." Public Utilities Code Section 702 states that "every public utility shall obey and comply with every order, decision, direction, or rule made or prescribed by the commission in the matters specified in this part, or any other matter in any way relating to or affecting its business as a public utility, and shall do everything necessary or proper to secure compliance therewith by all of its officers, agents, and employees." Such compliance is absolutely necessary to the proper functioning of the regulatory process. For this reason, disregarding a statutory or Commission directive, regardless of the effects on the public, will be accorded a high level of severity.

## 2. Conduct of the Utility

In D.98-12-075, the Commission held that the size of the fine should also take into account the utility's conduct in preventing, detecting, and resolving the violation.

### a. Actions to Prevent and Detect Violations

In this case, Verizon claims to have been unaware of § 320 prior to the construction of

facilities along the Scenic Highway corridor. However, D.98-12-075 states that prudent practice requires that all public utilities take reasonable steps to ensure compliance with Commission directives. This includes becoming familiar with applicable laws and regulations.

### b. Actions to Disclose and Remedy Violations

Once Verizon became aware of its violation, no remedial action was taken. Commission staff suggested solutions that would satisfy stakeholders, but Verizon has continued to be unresponsive.

## 3. Financial Resources of the Utility

CD has evaluated Verizon's financial records for 2008-2009 to assess the company's financial resources to pay the penalty amount. Based on the chart below, Verizon has the resources to pay the recommended fine by CD.

28

| | 2009 - \$10.4 billion |
|---|---|
| Net Income - Verizon Communications, Inc. and Subsidiaries (2009 Annual Report) | 2008 - \$12.6 billion |
| | 2007 - \$10.6 billion |
| § 320, D.80864 | Violated from 1982-2000 |
| § 2107, authority to assess penalty | Authorizes fines of |
| | \$500 to \$20,000 per each offense. |
| Imposed Penalty | \$5,000 |
| Total fine amount | \$5,000 |

### 4. Totality of the Circumstances in Furtherance of the Public Interest

In D.98-12-075, the Commission held that the fine level should be set such that it effectively deters further unlawful conduct by the company, while being specifically tailored to the unique facts of the case. The facts that tend to mitigate the degree of wrongdoing will be balanced with those that aggravate the level of wrongdoing.

While Verizon did not purposefully violate § 320 in its construction of the fiber optic facilities along Highway 395, Verizon has been unresponsive to suggested means of remedying the situation. Evaluating Verizon's actions against the criteria embodied in D.98-12-075, the Commission concludes that Verizon's violations have predominantly caused harm to the regulatory process.

### 5. The Role of Precedent

This is the first post-construction violation of § 320. Therefore there is no precedent to analyze.

Under Section 2107, the Commission has regulatory authority to assess a penalty not less than

\$500, nor more than \$20,000 for each offense, for which a penalty has not otherwise been provided. Consistent with other concurrent Verizon applications for § 320 exemption, the fine is set at \$5,000.

### Conclusion

Based on the information reviewed by CD, Verizon's application for deviation from § 320 undergrounding waiver should be approved for the entirety of the project length along Highway 395 in Mono County.

Undergrounding is preferable in most instances where costs are minimal, but the 5:1 ratio to underground is consistent with other § 320 exemptions granted. Additionally, it would not provide a high degree of public benefit since this project, if undergrounded, would still leave the highly visible electric facilities.

29

However, Verizon's non-compliance with D.80864 and § 320 is unacceptable. It is Verizon's responsibility as a regulated carrier to comply with all CPUC codes and regulations specific to California Scenic Highways. There is no justification or reason for Verizon's inability to meet the requirements mandated by § 320.

Based on all the data and information reviewed by CD staff, Verizon's request for a deviation in accordance with § 320 is reasonable, and therefore, granted, conditional upon submission of a plan for future compliance with § 320, application for CASF funds to make broadband available to two currently unserved communities, and payment of a fine in the amount of $5,000.

The penalty amount of $5,000 shall be paid in full 60 days following the date of this Resolution. Payment shall be made to the California Public Utilities Commission and remitted to the CPUC's Fiscal Office, 3rd Fl. Rm. 3000, 505 Van Ness Avenue, San Francisco, CA 94102-3298. The resolution number and fine amount should be noted in the memo section of the check, and a copy of the transmittal shall be provided to the Director of the Communications Division.

**Findings**

1. Public Utilities Code Section 320 (§ 320) was enacted in 1971.

2. Decision 80864 (74 CPUC 457) authorizes the California Public Utilities Commission (Commission) to accept, review and, where appropriate, approve §320 waiver permission by Commission Resolution.

3. Portions of Highway 395 in Mono County received designation as a Scenic Highway in 1964.

4. A group of local citizens contacted the Commission in 2008 requesting enforcement of § 320 along Highway 395. After investigation, the Commission found that Verizon California, Inc. (Verizon) did violate § 320, and directed Verizon to apply for § 320 exemption.

5. By letter addressed to the Executive Director of the Commission and dated July 17, 2008, Verizon requested authority for deviation from the undergrounding requirements of § 320 of the Public Utilities Code.

6. By letter addressed to the Communications Division (CD) Director and dated November 23, 2009, Stephen Kalish, resident of Mono County, protested Verizon's simultaneous § 320 exemption requests and asked the Commission to deny the requests and require Verizon to underground the telecommunications facilities.

7. By letter addressed to the CD Director and dated December 1, 2009, Verizon responded to Stephen Kalish's protest stating that Stephen Kalish's protest did not apply to this particular project in Mono County which is the subject of this resolution, because portions in question are not visible from the scenic highway, that this request was not a filed as an Advice Letter but rather in a letter to the Executive Director of the Commission. Verizon also stated that the relief requested is consistent with law and with Commission precedent.

30

8. The Commission administers § 320 requiring undergrounding of utilities lines along designated Scenic Highways and the process by which to request exemptions.

9. Verizon does not contest that the aerial facilities were constructed on a Scenic Highway 395 in violation of § 320 and does not propose any remedy other than requesting a waiver.

10. Verizon has requested multiple exemptions from § 320 for non-compliant previously completed construction, indicating the need for a written plan for compliance with § 320 prior to beginning any new construction near a Scenic Highway.

11. This project adds approximately 32,000 feet of aerial cable, less than one inch in diameter, black in color, along Highway 395.

12. The Commission finds that the utility cost ratio to place telephone lines underground as opposed to aerial at this location is approximately 5:1.

13. The Commission finds that undergrounding these facilities on Highway 395 would not be economically feasible or consistent with sound environmental planning.

14. The Commission finds that the deviation request from the undergrounding requirements of § 320 should be granted for this project, with the following conditions:

> a. The remission of a fine in the amount of $5,000.

> b. The drafting and implementation of a compliance plan for future construction of overhead distribution facilities along state scenic highways.

> c. Verizon has submitted an application for a grant from the California Advanced Services Fund to serve the two currently unserved communities of Swall Meadows and Crowley Lake.

15. The Commission finds that the communications infrastructure that Verizon installed is currently operational and is necessary for the public safety and economic viability of the communities it served.

THEREFORE, IT IS ORDERED THAT:

1. Verizon California, Inc.'s request to deviate from Public Utilities Code Section 320 for 32,000 feet of existing overhead facilities from 3,400 feet south of McGee Creek Road to the aerial crossing 1,000 feet north of Highway 203 along Highway 395 in Mono County, an Officially Designated State Scenic Highway, is conditionally approved.

2. Verizon California, Inc. shall, within 60 days upon approval of this resolution, pay a penalty in the amount of $5,000 for failure to comply with Public Utilities Code Section 320.

31

3. Verizon California, Inc. has applied for a California Advanced Services Fund grant to provide broadband to the communities of Swall Meadows and Crowley Lake. Verizon must make these service offerings available within 18 months of the approval of this resolution, regardless of the outcome of its CASF application.

4. Verizon California, Inc. must submit a plan for future construction of communications facilities within California Designated State Scenic Highway areas. This plan should contain all the actions necessary for construction of communications facilities including procedures for:

> a. Discerning whether construction of facilities is within a Designated State Scenic Highway area;

> b. Obtaining permits and/or authorization from governmental agencies, including a list of governmental agencies from which permits and/or authorization would be necessary;

> c. Providing notification to governmental agencies with interest, including the Commission, and facilitation for public comment by interested parties should Verizon California, Inc. seek additional exemptions to Public Utilities Code Section 320.

5. Verizon California, Inc. will have 60 days upon approval of this resolution to meet and complete the above remediation requirements, and will attest to the completion of the above conditions by filing a Tier 2 Advice Letter with the Communications Division.

6. Upon verification that Verizon California, Inc. has met the requirements stated herein, the deviation request will be effective.

I hereby certify that the Public Utilities Commission adopted this Resolution at its regular meeting on July 28, 2011. The following Commissioners voting favorably thereon:

/s/ Paul Clanon

Paul Clanon

Executive Director

MICHAEL R. PEEVEY

President
TIMOTHY ALAN SIMON
MICHEL PETER FLORIO
CATHERINE J.K. SANDOVAL
MARK J. FERRON
Commissioners

---

[1] All citations are to the Public Utilities Code unless otherwise indicated.

<sup>2</sup> In its filing Verizon also refers to its request for `"waiver". The language in Section 320 is "deviation."

<sup>3</sup> 74 CPUC 457, D.80864

<sup>4</sup> Attendees included representatives from: CalTrans, Concerned Residents of Swall Meadows, Kern Community College District, Mono County, Mono County Community Development Department, Mono County Planning Department, Mono County Public Works Department, NPG Cable, the Sierra Club, Town of Mammoth Lakes, Town of Mammoth Lakes Public Works, USFS, and Verizon.

10.

BEFORE THE PUBLIC UTILITIES CO ISSION OF SOUTH DAKOTA
IN THE MATTER OF THE PETITION OF )
CELLCO PARTNERSHIP
SUBSIDIARIES AM) AFF TO TC10-090
AMEND AND CONSOLIDAT
TELECOMNZUNICATIONSC
DESIGNATIONS IN THE STATE OF SOUTH )
DAKOTA AND TO PARTIALLY

RELINQUISH ETC DESIGNATION 1
IRECT TESTIMONY OF
LINDA STEVENS
ON BEHALF OF
VERIZON WIRELESS
TABLE OF CONTENTS
Page

I. WITNESS BACKGROUND AND PURPOSE OF TESTIMONY
................................1

....................................II. VERIZON WIRELESS'
ORGANIZATIONAL STRUCTURE 3
III. THE VERIZON WIRELESS-RCC AND VERIZON WIRELESS-ALLTEL
MERGERS

.................................................................................
...................................6

IV. THE PETITION
.................................................................................
..............................11

V. VERIZON WIRELESS CONTINUES TO SATISFY THE APPLICABLE
ETC REQUIREMENTS AND OBLIGATIONS IN SOUTH DAKOTA
.......................14

.1 Overview of the ETC
Requiremeilts...................................................................
14

2. Verizon Wireless Provides Service as a Colninon Carrier
....................................17

3. Verizon Wireless Offers Each of the Supported Services Using its Own
Facilities
.................................................................................
........................ 17

4. Verizon Wireless Advertises the Availability of. and Correspotlding Charges for. the Supported Services
.............................................................................21

5 . Verizon Wireless Offers the Supported Services Throughout the
.................................................................................
...............Designated Area 21

6. Verizon Wireless Will Continue to Utilize High-Cost Universal Service
Support to Iinprove and Operate the Company's Network Serving the Designated Area

36

........................................................................................
..............24

7. Verizon Wireless Has the Ability to Reinain Functional During
Einergency Situations
........................................................................................
......26

8. Verizon Wireless Satisfies Applicable Consuiner Protection and
Service
........................................................................................
..............Quality Standards 28

9. Verizon Wireless Provides Comparable Local Usage Plans
...............................29

..........................................................10. Verizon Wireless Can
Provide Equal Access 30

VI. APPROVAL OF THE PETITION IS IN THE PUBLIC INTEREST
............................ 30

VII. SUMMARY OF TESTIMONY
........................................................................................

33 WTNESS BACKGRO AND PURPOSE OF TESTIMONY
PLEASESTATE YOUR NAME, POSITION AND BUSINESS ADDRESS.
My name is Linda Stevens. I am employed as the Associate Director -
Finance for
Cellco Partnership d/b/a Verizon Wireless ("Cellco"). My business
address is Verizon

Wireless, One Verizon Place, Alpharetta, GA 30004-8511.
WHATARE YOUR DUTIES AND RESPONSIBILITIES?
I am primarily responsible for the management and administration of
eligible
telecolnlnunications carrier ("ETC") regulatory, colnpliance and
reporting matters for
Cellco and its subsidiaries and affiliated legal entities (collectively,

"Verizon Wireless"

37

or "Company"). In this capacity, I have developed an understanding of the regulatory
standards and requirements applicable to ETCs. I also have knowledge about the
network, products and services offered by Verizon Wireless, as well as Verizon Wireless'
business operations and procedures relating to its status as an ETC.

PLEASE DESCRIBE YOUR EXPERIENCE AS IT RELATES TO ETC REQUIREMENTS AND
COMPLIANCE MATTERS.

In 2004, I began working with several of Verizon Wireless' affiliates and managed
part~lershipsto evaluate whether to seek designation as a federal ETC and undertake the
associated obligations of a competitive ETC. This process included analyzing the
applicable ETC designation criteria and the evaluation, development and ilnplelnentation
of business practices and procedures to meet the service obligations and coinpliance
reporting requirements once designated. In late 2008 and early 2009, Verizon Wireless
acquired the operations of Rural Cellular Corporation ("RCC") and Alltel Corporation
("Alltel"), including their respective subsidiaries and affiliates, and proceeded to merge
those operations with the Verizon Wireless operations. Several of the RCC and Alltel
subsidiaries and affiliates had been previously designated as competitive ETCs. In
August 2008, Verizon Wireless created an ETC Program Group to oversee the ETC
compliance and reporting obligations in the areas where the Conlpany serves as a

competitive ETC. I work in a supervisory role for Verizon Wireless' ETC Program

Group.

WHATIS TWE PURPOSE OF YOUR TESTIMONY?

I am submitting this testimony on behalf of Verizon Wireless in support of the "Petition

of Cellco Partnership and its Subsidiaries and Affiliates to Amend and

38

Consolidate

Eligible Telecon~~nunicatio~~sCarrier Designations in the State of South Dakota and to

Partially Relinquish ETC Designation" ("Petition"). WWC License, LLC d/b/a Verizon

Wireless, successor to GCC License Corporation, ("WWC") is currently designated as a

competitive federal ETC in South Dakota (the "WWC ETC Designation"). Separately,

RCC Minnesota, Inc. d/b/a Verizon Wireless ("RCC") is currently designated as a

con~petitivefederal ETC in South Dakota (the "RCC ETC Designation"). In support of

the Company's request to anlend and consolidate the WWC ETC Designation and RCC

ETC Designation orders to reflect that it is now the consolidated Verizon Wireless

operations that serve the designated ETC service area, I will describe how the Company

continues to satisfy the applicable federal and state conlpetitive ETC requirelnents and

obligations in South Dakota. The Petition further requested that the WWC ETC

Designation be partially relinquished in one Golden West Telecommunications

Cooperative, Inc. ("Golden West") study area -that partial relinquishment was approved

by the Commission on November 18,2010.

HAVE YOU PREVIOUSLY SUBMITTED INFORMATION LN SUPPORT OF THE PETITION?

Yes. I subnlitted a Certification that was filed as Exhibit D to the Petition.

The
Certification addresses many of the issues relevant to the relief requested
in the Petition.
2
II. VERIZON WIRELESS' ORGANIZATIONAL STRUCT
WHOIS CELLCO?
Cellco Partnership d/b/a Verizon Wireless is a Delaware general
partnership
headquartered in Basking Ridge, New Jersey. Cellco is the ultimate parent
company

39

which owns or controls all of the subsidiary and affiliated entities that
operate as Verizoil
Wireless.
On January 9, 2009, Cellco completed a transaction with Atlantis
Holdings LLC
("Atlantis"), a Delaware limited liability company, which owned Alltel
and its subsidiary
corporations and had ownership interests in various controlled and non-
controlled
partnerships (the "Verizon Wireless-Alltel merger"). At the time of the
Verizon
Wireless-Alltel merger, WWC was a wholly-owned subsidiary of Alltel.
AT THE TIME OF THE VERIZONWIRELESS-ALLTELMERGER,
WAS WWC OPERATING IN
SOUTHDAKOTA?

**FACTS**

11, THE PLAINTIFF has been a customer of THE DEFENCAHT for forty years. As

mentioned briefly in the introduction, this complaint arises fro an attempt on the part of

THE PLAINTIFF to switch cellular phone service from THE DEFENDANT to MINT

MOBILE.  This decision to make this switch was purely financial, as Mint Mobile can provide the exact same service that I currently enjoy with THE DEFENDANT for fully one half the monthly fee.

13.  Making a switch of this nature is, ordinarily, s simple task.

14.  It involves removing THE DEFENDANT'S SIM (subscriber identification module) card and replacing it with one that is proprietary to MINT MOBILE.

15.  THE PLAINTIFF contacted MINT MOBILE by phone, and discussed various data plans.

40

16.  Shortly there after, THE PLAINTIFF received, by mail, from MINT MOBILE, two SIM cards with simple instructions for insertion and then phone activation (two because it was necessary to modify my phone and my spouse's phone simultaneously to enable us to communicate with each other).

17.  THE PLAINTIFF replaced THE DEFENDANT'S card with the one from MINT MOBILE, and followed the simple instructions to activate the phone.

18.  The operation was unsuccessful.

19.  Not overly concerned, THE PLAINTIFF simply re-inserted THE DEFENDANT'S card, only to discover that, at that juncture, that there was no cell service whatsoever.

20.  Three hours of DIY trouble shooting did not bear fruit.

21.  An immediate two hour trip to THE APPLE STORE was equally fruitless.

22.  Desperate, THE PLAINTIFF contacted THE DEFENDANT'S customer service department and described his dilemma.

24. The agent with whom THE PLAINTIFF spoke felt the immediate need to engage someone more senior that herself; either more senior managerially, or more senior technologically.

25. The agent set up a conference call with her, of course, a second agent with more expertise and me.

26. While the two of them discussed my situation, I had very little to add, though I could here the entire two hour conversation.

27. The two of them were working at their respective computer screens, in different parts of the country, and while I did not understand most of it, it sounded like they were

41

working with some very complex information systems with which neither of them seemed completely comfortable.

28. At one point, I heard the first agent tell the second agent that what they were trying to accomplish was a "WIN BACK"/

29. After two hours of manipulation, they were successful, and my phones were activated, and functional.

30. At one point in the encounter, the first agent stated to THE PLAINTIFF that it was the company's firm policy and practice that if a customer ATTEMPTS to engage with a competitor's service, THE DEFENDANT, through some technical means, is made aware of this attempt, and immediately DEACTIVATES that customer's phone, rendering it useless.

31. THE PLAINTIFF had no reason to doubt this statement and, therefore, took it at face value.

32. THE PLAINTIFF has since unearthed the WRITTEN "My Verizon Wireless Customer Agreement" (emphasis added), which he has reproduced in its entirety below.

33  THE PLAINTIFF has taken the liberty of enlarging only the section of the agreement that is relevant to this case. Note that the agreement states that after the transfer (porting) is "completed" (emphasis added) will the phone be deactivated..

42

. © 2021 Verizon
CA-1021EN

# My Verizon Wireless Customer Agreement

(Para una copia de este documento en español, visite nuestro website: verizon.com/espanol)
Thanks for choosing Verizon. In this Customer Agreement ("Agreement"), you'll find important information about your wireless Service, including:
• Our ability to make changes to your Service or this Agreement's terms.
• Our liability if things don't work as planned and how any disputes between us must be resolved in arbitration or small claims court.
My Service

Your Service terms and conditions are part of this Agreement. Your Plan includes your monthly allowances and features, where you can use them (your "Coverage Area"), and their monthly and pay-per-use charges. You can also subscribe to several Optional Services, like international service plans or equipment protection services. Together, your Plan, features you use and any Optional Services you select are your Service. Your billing and shipping addresses, and your primary place of use, must be within the areas served by the network Verizon owns and operates. The current version of this Agreement and the terms and conditions for your Service are available online at verizon.com. A description of permitted and prohibited uses for calling and Data Services is available online at verizon.com/support/important-plan-information; prepaid customers should visit verizon.com/support/prepaid-customer-info-legal.
By using the Service, you are agreeing to every provision of this Agreement whether or not you have read it. This agreement also applies to all lines on your account and anyone who uses your Service.
Cancellation
You can cancel a line of Service within 30 days of accepting this Agreement without having to pay an early termination fee as long as you return, within the applicable return

period, any equipment you purchased from us or one of our authorized retailers at a discount in connection with your acceptance of this Agreement, but you'll still have to pay for your Service through that date. If you signed up for Prepaid Service, no refunds will be granted after 30 days or if your account has been activated. See verizon.com/support/return-policy/ for complete details and information on returning your equipment.
My Privacy

Accepting this Agreement means that you also agree to our Privacy Policy, available at verizon.com/privacy, which may be updated from time to time and describes the information we collect, how we use and share it, and the choices you have about how certain information is used and shared. We will notify you or ask for your permission, as appropriate, if we plan to use your information for additional purposes. It is your responsibility to let the people who connect devices through your mobile hotspot, Jetpack or wireless router know that we will collect, use and share information about their device and use of the Service as described in our Privacy Policy.

If you subscribe to Service for which usage charges are billed at the end of the billing period ("Postpay Service"), or have a device payment installment agreement, we may investigate

43

your credit history at any time in connection with the service subscription or device payment installment agreement. If you'd like the name and address of any credit agency that gives us a credit report about you, just ask.
CA-P.2

Many services and applications offered through your device may be provided by third parties. You should review the applicable terms and privacy policy before you use, link to or download a service or application provided by a third party.

You agree that Verizon and collections agencies that work on our behalf may contact you about your account status, including past due or current charges, using prerecorded calls, email and calls or messages delivered by an automatic telephone dialing system to any wireless phone number, other contact number or email address you provide. Verizon will treat any email address you provide as your private email that is only accessible by you; you acknowledge that we may send you receipts, notices and other documents regarding your service to this email address. Unless you notify us that your wireless service is based in a different time zone, calls will be made to your cellular device during permitted calling hours based upon the time zone affiliated with the mobile telephone number you provide.

What happens if my Postpay Service is canceled before the end of my contract term?
If you're signing up for Postpay Service, you're agreeing to subscribe to a line of Service either on a month-to-month basis or for a minimum contract term, as shown on your receipt or order confirmation. (If your Service is suspended without billing or at a reduced billing rate, that time doesn't count toward completing your contract term.) Once you've completed your contract term, you'll automatically become a customer on a month-to-month basis for that line of Service. If your line of service has a contract term and you cancel that line, or if we cancel it for good cause, during that contract term, you'll have to pay an early termination fee. If your contract term results from your purchase of an advanced device, your early termination fee will be $350, which will decline by $10 per month upon completion of months 7 – 17, $20 per month upon completion of months 18 – 22, $60 upon completion of month 23 and will be $0 upon completion of the contract term. For other contract terms, your early termination fee will be $175, which will decline by $5 per month upon completion of months 7 – 17, $10 per month upon completion of months 18 – 22, $30 upon completion of month 23 and will be $0 upon completion of your contract term. Cancellations will become effective on the last day of that month's billing cycle, and you are responsible for all charges incurred until then. Also, if you bought your wireless device from an authorized agent or

third-party vendor, you should check whether it charges a separate termination fee.
If you purchased a device on a monthly installment agreement and cancel service, you should check that agreement to determine if you may have to immediately pay off the balance.
Your Mobile Number and Porting

You may be able to transfer, or "port," your wireless phone number to another carrier. If you

port a number from us, we'll treat it as though you asked us to cancel your Service for that

number. After the porting is completed, you won't be able to use our service for that number,

but you'll remain responsible for all fees and charges through the end of that billing cycle, just like any other cancellation. If you're a Prepaid customer, you won't be entitled to a refund of any balance on your account. If you port a number to us, please be aware that we may not

44

be able to provide some services right away, such as 911 location services. You don't have

any rights to your wireless phone number, except for any right you may have to port it. After a line of service is disconnected, for any reason, the disconnected Mobile Telephone Number (MTN) may not be suspended or otherwise reserved and may not be able to be recovered.
Can I have someone else manage my Postpay account?
No problem—just tell us by phone, in person or in writing. You can appoint someone to manage your Postpay account. The person you appoint (the Account Manager) will be able to make changes to your account, including adding new lines of Service, buying a new wireless device(s) on a device payment agreement based upon your credit history, billing certain services and accessories to your account, and extending your contract term. Any changes that person makes will be treated as modifications to this Agreement.
Can Verizon change this Agreement or my Service?
We may change prices or any other term of your Service or this Agreement at any time, but we'll provide notice first, including written notice if you have Postpay Service. If you use your Service after the change takes effect, that means you're accepting the change. If you're a Postpay customer and a change to your Plan or this Agreement has a material adverse effect on you, you can cancel the line of Service that has been affected within 60 days of receiving the notice with no early termination fee if we fail to negate the change after you notify us of your objection to it. Notwithstanding this provision, if we make any changes to the dispute resolution provision of this Agreement, such changes will not affect the resolution of any disputes that arose before such change.
CA-P.3

My wireless device
Your wireless device must comply with Federal Communications Commission regulations, be certified for use on our network and be compatible with your Service. Please be aware that we may change your wireless device's software, applications or programming remotely, without notice. This could affect your stored data, or how you've programmed or use your wireless device. By activating Service that uses a SIM (Subscriber Identity Module) card, you agree we own the intellectual property and software in the SIM card, that we may change the software or other data in the SIM card remotely and without notice, and we may utilize any capacity in the SIM card for administrative, network, business and/or commercial purposes. In order to mitigate theft and other fraudulent activity, newly purchased devices may be locked to work exclusively on the Verizon Network for 60 days. For more information, visit verizon.com/support/device-unlocking-policy.

Internet access

If you download or use applications, services or software provided by third parties (including voice applications), 911 or E911, or other calling functionality, may work differently than services offered by us or may not work at all. Please review all terms and conditions of such third-party products. Verizon Wireless is not responsible for any third-party information, content, applications or services you access, download or use on your device. You are responsible for maintaining virus and other internet security protections when accessing these third-party products or services. For additional information, visit the Verizon Content Policy at verizon.com/about/our-company/company-policies. To learn about content filtering and how you may block materials harmful to minors, visit vzw.com/solutions-and-services/content-filters/. For information about our network management practices for our broadband internet access services, visit verizon.com/about/our-company/open-internet.

Where and how does Verizon wireless Service work?

Wireless devices use radio transmissions, so unfortunately you can't get Service if your

45

device isn't in range of a transmission signal. And please be aware that even within your Coverage Area, many things can affect the availability and quality of your Service, including network capacity, your device, terrain, buildings, foliage and weather.

How does Verizon calculate my charges?

You agree to pay all access, usage and other charges that you or any other user of your wireless device incurred. If multiple wireless devices are associated with your account, you agree to pay all charges incurred by users of those wireless devices. For charges based on the amount of time used or data sent or received, we'll round up any fraction to the next full minute or, depending on how you're billed for data usage, the next full megabyte or gigabyte. For outgoing calls, usage time starts when you first press Send or the call connects to a network, and for incoming calls, it starts when the call connects to a network (which may be before it rings). Usage time may end several seconds after you press End or after the call disconnects. For calls made on our network, we charge only for calls that are answered, including by machines. For Postpay Service, usage cannot always be processed right away and may be included in a later bill, but the usage will still count toward your allowance for the month when the Service was used.

What charges are set by Verizon?

Our charges may also include Federal Universal Service, Regulatory and Administrative Charges, and we may also include other charges related to our governmental costs. We set these charges; they aren't taxes, they aren't required by law, they are not necessarily related to anything the government does, they are kept by us in whole or in part, and the amounts and what they pay for may change. For more information, visit verizon.com/support/surcharges/.

Government taxes, fees and surcharges

You must pay all taxes, fees and surcharges set by federal, state and local governments. Please note that we may not always be able to notify you in advance of changes to these charges.

What is roaming?

You're "roaming" whenever your wireless device connects to a network outside your Coverage Area or connects to another carrier's network, which could happen even within your Coverage Area. There may be higher rates or extra charges (including charges for long distance, tolls or calls that don't connect), and your data service may be limited or slowed when roaming.

How can I prevent unintended charges on my bill or block spam calls?

Many services and applications are accessible on or through wireless devices, including purchases of games, movies, music and other content. Some of these services are provided CA-P.4

by Verizon. Others are provided by third parties that may offer the option to bill the charges to your Verizon bill or other methods of payment. Charges may be one-time or recurring. The amount and frequency of the charges will be disclosed to you or the person using your device or a device associated with your account at the time a purchase is made. If the

purchaser chooses to have the charges billed to your account, such charges will become part of the amount due for that billing cycle. Verizon offers tools to block or restrict these services, and to block all billing for third-party services on your Verizon wireless bill, at verizon.com/myverizon. We do not support calls to 900, 976 and certain other international premium rate numbers.

Verizon automatically blocks in the network many calls that are highly likely to be illegal, such as calls from telephone numbers that are not authorized to make outbound calls. Additionally, your Service includes access to optional blocking tools for unwanted robocalls through our Call Filter service to which you may be auto-enrolled. This service sends to voicemail many calls we determine to be high-risk spam, but you can adjust your spam filter preferences to block more or less calls. Visit verizon.com/about/responsibility/robocalls for more info.
How and when can I dispute charges?

46

If you're a Postpay customer, you can dispute your bill within 180 days of receiving it, but unless otherwise provided by law or unless you're disputing charges because your wireless device was lost or stolen, you still have to pay all charges until the dispute is resolved. If you're a Prepaid customer, you can dispute a charge within 180 days of the date the disputed charge was incurred. YOU MAY CALL US TO DISPUTE CHARGES ON YOUR BILL OR ANY SERVICE(S) FOR WHICH YOU WERE BILLED, BUT IF YOU WISH TO PRESERVE YOUR RIGHT TO BRING AN ARBITRATION OR SMALL CLAIMS CASE REGARDING SUCH DISPUTE, YOU MUST WRITE TO US AT THE CUSTOMER SERVICE ADDRESS ON YOUR BILL, OR SEND US A COMPLETED NOTICE OF DISPUTE FORM (AVAILABLE AT VERIZON.COM), WITHIN THE 180-DAY PERIOD MENTIONED ABOVE. IF YOU DO NOT NOTIFY US IN WRITING OF SUCH DISPUTE WITHIN THE 180-DAY PERIOD, YOU WILL HAVE WAIVED YOUR RIGHT TO DISPUTE THE BILL OR SUCH SERVICE(S) AND TO BRING AN ARBITRATION OR SMALL CLAIMS CASE REGARDING ANY SUCH DISPUTE.
What are my rights for dropped calls or interrupted Service?

If you drop a call in your Coverage Area, redial. If it's answered within 5 minutes, call us within 90 days if you're a Postpay customer or within 45 days if you're a Prepaid customer, and we'll give you a 1-minute airtime credit. If you're a Postpay customer and you lose Service in your Coverage Area for more than 24 hours in a row and we're at fault, call us within 180 days and we'll give you a credit for the time lost. Please be aware that these are your only rights for dropped calls or interrupted Service.
Billing and payments

If you're a Postpay customer and we don't get your payment on time, we will charge you a late fee of up to 1.5% per month (18% per year) on the unpaid balance, or a flat $5 per month, whichever is greater, if allowed by law in the state of your billing address. (If you choose to have your Service billed by another company [pursuant to a Verizon-approved program], late fees are set by that company and may be higher than our late fees.) Late fees are part of the rates and charges you agree to pay. If you fail to pay on time and we refer your account(s) to a third party for collection, a collection fee will be assessed and will be due at the time of the referral to the third party. The fee will be calculated at the maximum percentage permitted by applicable law, not to exceed 18%. We may require a deposit at the time of activation or afterward, or an increased deposit. We'll pay simple interest on any deposit at the rate the law requires. We may apply deposits or payments in any order to any amounts you owe us on any account. If your final credit balance is less than $1, we will refund it only if you ask. If your service is suspended or terminated, you may have to pay a fee to have service reactivated.

If you're a Prepaid customer, you may replenish your balance at any time before the expiration date by providing us with another payment. If you maintain a Prepaid account balance, it may not exceed $1,000 and you may be prevented from replenishing if your balance reaches $1,000. We may apply your payments to any amounts you may owe us if your earlier account replenishment payments had been reversed. If you do not have sufficient funds in your account to cover your Service, and sufficient funds are not added within 60

days, your account will be canceled and any unused balance will be forfeited.
We may charge you up to $25 for any returned check. The substantive laws of Pennsylvania shall be applied to disputes related to checks tendered as payment in full for less than the full balance due, without regard to the conflicts of laws and rules of that state. If you make a payment, or make a payment arrangement, through a call center representative, we may charge you an Agent Assistance Fee.
What if my wireless device gets lost or stolen?
We're here to help. It's important that you notify us right away, so we can suspend your Service to keep someone else from using it. If you're a Postpay customer and your wireless

47

device is used after the loss or theft but before you report it, and you want a credit for any charges for that usage, we're happy to review your account activity and any other information you'd like us to consider. Keep in mind that you may be held responsible for the charges if you delayed reporting the loss or theft without good reason, but you don't have to pay an

charges you dispute while they are being investigated. If you are a California customer and we haven't given you a courtesy suspension of recurring monthly charges during the past year, we'll give you one for 30 days or until you replace or recover your wireless device, whichever comes first.
What are Verizon's rights to limit or end Service or end this Agreement?
We can, without notice, limit, suspend or end your Service or any agreement with you for any good cause, including, but not limited to: (1) if you: (a) breach this agreement or violate our prohibited usage policies; (b) resell your Service; (c) use your Service for any illegal purpose, including use that violates trade and economic sanctions and prohibitions promulgated by any US governmental agency; (d) install, deploy or use any regeneration equipment or similar mechanism (for example, a repeater) to originate, amplify, enhance, retransmit or regenerate an RF signal without our permission; (e) steal from or lie to us; or, if you're a Postpay customer; (f) do not pay your bill on time; (g) incur charges larger than a required deposit or billing limit, or materially in excess of your monthly access charges (even if we haven't yet billed the charges); (h) provide credit information we can't verify; (i) are unable to pay us or go bankrupt; or (j) default under any device financing agreement with Verizon; or (2) if you, any user of your device or any line of service on your account, or any account manager on your account: (a) threaten, harass, or use vulgar and/or inappropriate language toward our representatives; (b) interfere with our operations; (c) "spam," or engage in other abusive messaging or calling; (d) modify your device from its manufacturer's specifications; or (e) use your Service in a way that negatively affects our network or other customers. We can also temporarily limit your Service for any operational or governmental reason.
Am I eligible for special discounts?
If you're a Postpay customer, you may be eligible for a discount if you are and remain affiliated with an organization that has an agreement with us. Unless your discount is through a government employee discount program, we may share certain information about your Service (including your name, your wireless telephone number and your total monthly charges) with your organization from time to time to make sure you're still eligible. We may adjust or remove your discount according to your organization's agreement with us, and remove your discount if your eligibility ends or your contract term expires. In any case, this won't be considered to have a material adverse effect on you.
DISCLAIMER OF WARRANTIES
We make no representations or warranties, express or implied, including, to the extent permitted by applicable law, any implied warranty of merchantability or fitness for a particular purpose, about your Service, your wireless device, or any applications you access through your wireless device. We do not warrant that your wireless device will work perfectly or will not need occasional upgrades or modifications, or that it will not be negatively affected by network-related modifications, upgrades or similar activity.
WAIVERS AND LIMITATIONS OF LIABILITY

You and Verizon both agree to limit claims against each other solely to direct damages. That means neither of us will claim any damages that are indirect, special, consequential, incidental, treble or punitive. For example, disallowed damages include those arising out of a Service or device failure, unauthorized access or changes to your account or device, or the use of your account or device by others to authenticate, access or make changes to a third-party account, such as a financial or cryptocurrency account, including changing

48

passwords or transferring or withdrawing funds. This limitation and waiver will apply regardless of the theory of liability. It also applies if you bring a claim against one of our suppliers, to the extent we would be required to indemnify the supplier for the claim. You agree we aren't responsible for problems caused by you or others, or by any act of God.

You also agree we aren't liable for missed or deleted voicemails or other messages, or for CA-P.5
CA-P.6
any information (like pictures) that gets lost or deleted if we work on your device. If another wireless carrier is involved in any problem (for example, while you're roaming), you also agree to any limitations of liability that it imposes.
HOW DO I RESOLVE DISPUTES WITH VERIZON?
WE HOPE TO MAKE YOU A HAPPY CUSTOMER, BUT IF THERE'S AN ISSUE THAT NEEDS TO BE RESOLVED, THIS SECTION OUTLINES WHAT'S EXPECTED OF BOTH OF US. YOU AND VERIZON BOTH AGREE TO RESOLVE DISPUTES ONLY BY ARBITRATION OR IN SMALL CLAIMS COURT, AS DISCUSSED BELOW. YOU UNDERSTAND THAT BY THIS AGREEMENT YOU ARE GIVING UP THE RIGHT TO BRING A CLAIM IN COURT OR IN FRONT OF A JURY. WHILE THE PROCEDURES IN ARBITRATION MAY BE DIFFERENT, AN ARBITRATOR CAN AWARD YOU THE SAME DAMAGES AND RELIEF, AND MUST HONOR THE SAME TERMS IN THIS AGREEMENT, AS A COURT WOULD. IF THE LAW ALLOWS FOR AN AWARD OF ATTORNEYS' FEES, AN ARBITRATOR CAN AWARD THEM TOO. THE SAME DEFENSES ARE ALSO AVAILABLE TO BOTH PARTIES AS WOULD BE AVAILABLE IN COURT, INCLUDING ANY APPLICABLE STATUTE OF LIMITATIONS. WE ALSO BOTH AGREE THAT:
(1) THE FEDERAL ARBITRATION ACT APPLIES TO THIS AGREEMENT. EXCEPT FOR SMALL CLAIMS COURT CASES, ANY DISPUTE THAT IN ANY WAY RELATES TO OR ARISES OUT OF THIS AGREEMENT, OR FROM ANY EQUIPMENT, PRODUCTS AND SERVICES YOU RECEIVE FROM US, OR FROM ANY ADVERTISING FOR ANY SUCH PRODUCTS OR SERVICES, OR FROM OUR EFFORTS TO COLLECT AMOUNTS YOU MAY OWE US FOR SUCH PRODUCTS OR SERVICES, INCLUDING ANY DISPUTES YOU HAVE WITH OUR EMPLOYEES OR AGENTS, WILL BE RESOLVED BY ONE OR MORE NEUTRAL ARBITRATORS BEFORE THE AMERICAN ARBITRATION ASSOCIATION ("AAA") OR BETTER BUSINESS BUREAU ("BBB"). YOU CAN ALSO BRING ANY ISSUES YOU MAY HAVE TO THE ATTENTION OF FEDERAL, STATE OR LOCAL GOVERNMENT AGENCIES, AND IF THE LAW ALLOWS, THEY CAN SEEK RELIEF AGAINST US FOR YOU. THIS AGREEMENT TO ARBITRATE CONTINUES TO APPLY EVEN AFTER YOU HAVE STOPPED RECEIVING SERVICE FROM US.
(2) UNLESS YOU AND VERIZON AGREE OTHERWISE, THE ARBITRATION WILL TAKE PLACE IN THE COUNTY OF YOUR BILLING ADDRESS. FOR CLAIMS OVER $10,000, THE AAA'S CONSUMER ARBITRATION RULES WILL APPLY. FOR CLAIMS OF $10,000 OR LESS, THE PARTY BRINGING THE CLAIM CAN CHOOSE EITHER THE AAA'S CONSUMER ARBITRATION RULES OR THE BBB'S RULES FOR BINDING ARBITRATION. YOU CAN GET PROCEDURES, RULES AND FEE INFORMATION FROM THE AAA (WWW.ADR.ORG), THE BBB (WWW.BBB.ORG) OR FROM US. FOR CLAIMS OF $10,000 OR LESS, YOU CAN CHOOSE WHETHER YOU'D LIKE THE ARBITRATION CARRIED OUT BASED ONLY ON DOCUMENTS SUBMITTED TO THE ARBITRATOR, OR BY A HEARING IN PERSON OR BY PHONE. ALTERNATIVELY, FOR CLAIMS WITHIN THE JURISDICTIONAL

LIMIT OF THE SMALL CLAIMS COURT IN THE STATE ENCOMPASSING YOUR BILLING
ADDRESS, EITHER YOU OR VERIZON CAN CHOOSE TO BRING AN INDIVIDUAL
ACTION IN SMALL CLAIMS COURT INSTEAD OF PROCEEDING IN ARBITRATION;

49

FURTHERMORE, IF THE CLAIMS IN ANY REQUEST OR DEMAND FOR ARBITRATION
COULD HAVE BEEN BROUGHT IN SMALL CLAIMS COURT, THEN EITHER YOU OR
VERIZON MAY CHOOSE TO HAVE THE CLAIMS HEARD IN SMALL CLAIMS COURT,
RATHER THAN IN ARBITRATION, AT ANY TIME BEFORE THE ARBITRATOR IS APPOINTED,

BY NOTIFYING THE OTHER PARTY OF THAT CHOICE IN WRITING. IF THIS PROVISION
OR THE LIMITATION ON BRINGING ACTIONS TO SMALL CLAIMS COURT IS FOUND TO
BE INVALID, THEN THIS PROVISION SHALL BE SEVERABLE AND THE MATTER WILL
PROCEED IN ARBITRATION; IN NO WAY WILL THIS PROVISION ALLOW FOR AN
ACTION TO BE BROUGHT ON A CLASS OR COLLECTIVE BASIS.
(3) THIS AGREEMENT DOESN'T ALLOW CLASS OR COLLECTIVE ARBITRATIONS
EVEN IF THE AAA OR BBB PROCEDURES OR RULES WOULD. NOTWITHSTANDING
ANY OTHER PROVISION OF THIS AGREEMENT, THE ARBITRATOR MAY AWARD
MONEY OR INJUNCTIVE RELIEF ONLY IN FAVOR OF THE INDIVIDUAL PARTY SEEKING
RELIEF AND ONLY TO THE EXTENT NECESSARY TO PROVIDE RELIEF WARRANTED
BY THAT PARTY'S INDIVIDUAL CLAIM. NO CLASS, REPRESENTATIVE OR PRIVATE
ATTORNEY GENERAL OR GENERAL INJUNCTIVE RELIEF THEORIES OF LIABILITY
OR PRAYERS FOR RELIEF MAY BE MAINTAINED IN ANY ARBITRATION HELD UNDER
THIS AGREEMENT. ANY QUESTION REGARDING THE ENFORCEABILITY OR
INTERPRETATION OF THIS PARAGRAPH SHALL BE DECIDED BY A COURT AND NOT
THE ARBITRATOR.
CA-P.7
(4) IF EITHER OF US INTENDS TO SEEK ARBITRATION UNDER THIS AGREEMENT, THE
PARTY SEEKING ARBITRATION MUST FIRST NOTIFY THE OTHER PARTY OF THE
DISPUTE IN WRITING AT LEAST 60 DAYS IN ADVANCE OF INITIATING THE ARBITRATION.
NOTICE TO VERIZON SHOULD BE SENT TO VERIZON WIRELESS DISPUTE RESOLUTION
MANAGER, ONE VERIZON WAY, BASKING RIDGE, NJ 07920. THE NOTICE MUST INCLUDE
ENOUGH INFORMATION TO ALLOW US TO IDENTIFY YOUR ACCOUNT AS WELL AS TO
ASSESS AND ATTEMPT TO RESOLVE YOUR CLAIM, INCLUDING THE NAME OF THE
VERIZON WIRELESS ACCOUNT HOLDER, THE MOBILE TELEPHONE NUMBER AT ISSUE,
A DESCRIPTION OF THE CLAIM, THE SPECIFIC FACTS SUPPORTING THE CLAIM,
THE DAMAGES YOU CLAIM TO HAVE SUFFERED AND THE RELIEF YOU ARE SEEKING.
THE NOTICE REQUIREMENT IS DESIGNED TO ALLOW VERIZON TO MAKE A FAIR,
FACT-BASED OFFER OF SETTLEMENT IF IT CHOOSES TO DO SO. YOU CANNOT
PROCEED TO ARBITRATION UNLESS YOU PROVIDE THIS INFORMATION. YOU MAY
CHOOSE TO BE REPRESENTED BY AN ATTORNEY OR OTHER PERSON AS PART OF
THIS PROCESS, BUT IF YOU DO YOU MUST SUBMIT A LETTER OR THE FORM
AVAILABLE AT THIS LINK AUTHORIZING US TO DISCUSS YOUR ACCOUNT INFORMATION
WITH THIS ATTORNEY OR OTHER PERSON. THE SUFFICIENCY OF THIS NOTICE IS AN
ISSUE TO BE DECIDED BY A COURT PRIOR TO THE FILING OF ANY DEMAND FOR
ARBITRATION. IF YOU HAVE PROVIDED THIS INFORMATION AND WE ARE UNABLE TO
RESOLVE OUR DISPUTE WITHIN 60 DAYS, EITHER PARTY MAY THEN PROCEED TO
FILE A CLAIM FOR ARBITRATION. WE'LL REIMBURSE ANY FILING FEE THAT THE AAA
OR BBB CHARGES YOU FOR ARBITRATION OF THE DISPUTE AT THE CONCLUSION
OF THE ARBITRATION IF YOU FULLY PARTICIPATE IN THE PROCEEDING. WE'LL ALSO
PAY ANY ADMINISTRATIVE AND ARBITRATOR FEES CHARGED BY THE ARBITRATION
TRIBUNAL. IF THE ARBITRATOR DETERMINES THAT YOUR CLAIM WAS FILED FOR
PURPOSES OF HARASSMENT OR IS PATENTLY FRIVOLOUS, THE ARBITRATOR WILL
REQUIRE YOU TO REIMBURSE VERIZON FOR ANY FILING, ADMINISTRATIVE OR
ARBITRATOR FEES ASSOCIATED WITH THE ARBITRATION.

50

(5) WE MAY, BUT ARE NOT OBLIGATED TO, MAKE A WRITTEN SETTLEMENT OFFER ANYTIME BEFORE THE ARBITRATION HEARING. THE AMOUNT OR TERMS OF ANY SETTLEMENT OFFER MAY NOT BE DISCLOSED TO THE ARBITRATOR UNTIL AFTER THE ARBITRATOR ISSUES AN AWARD ON THE CLAIM. IF YOU DON'T ACCEPT THE

OFFER AND THE ARBITRATOR AWARDS YOU AN AMOUNT OF MONEY THAT'S MORE THAN OUR OFFER BUT LESS THAN $5,000, OR IF WE DON'T MAKE YOU AN OFFER, AND THE ARBITRATOR AWARDS YOU ANY AMOUNT OF MONEY BUT LESS THAN $5,000, THEN WE AGREE TO PAY YOU $5,000 INSTEAD OF THE AMOUNT AWARDED. IN THAT CASE WE ALSO AGREE TO PAY ANY REASONABLE ATTORNEYS' FEES AND EXPENSES, REGARDLESS OF WHETHER THE LAW REQUIRES IT FOR YOUR CASE. IF THE ARBITRATOR AWARDS YOU MORE THAN $5,000, THEN WE WILL PAY YOU ONLY THAT AMOUNT.
(6) IF 25 OR MORE CUSTOMERS INITIATE NOTICES OF DISPUTE WITH VERIZON WIRELESS RAISING SIMILAR CLAIMS, AND COUNSEL FOR THE VERIZON WIRELESS CUSTOMERS BRINGING THE CLAIMS ARE THE SAME OR COORDINATED FOR THESE CUSTOMERS, THE CLAIMS SHALL PROCEED IN ARBITRATION IN A COORDINATED PROCEEDING. COUNSEL FOR THE VERIZON WIRELESS CUSTOMERS AND COUNSEL FOR VERIZON WIRELESS SHALL EACH SELECT FIVE CASES TO PROCEED FIRST IN ARBITRATION IN A BELLWETHER PROCEEDING. THE REMAINING CASES SHALL NOT BE FILED IN ARBITRATION UNTIL THE FIRST TEN HAVE BEEN RESOLVED. IF THE PARTIES ARE UNABLE TO RESOLVE THE REMAINING CASES AFTER THE CONCLUSION OF THE BELLWETHER PROCEEDING, EACH SIDE MAY SELECT ANOTHER FIVE CASES TO PROCEED TO ARBITRATION FOR A SECOND BELLWETHER PROCEEDING. THIS PROCESS MAY CONTINUE UNTIL THE PARTIES ARE ABLE TO RESOLVE ALL OF THE CLAIMS, EITHER THROUGH SETTLEMENT OR ARBITRATION. A COURT WILL HAVE AUTHORITY TO ENFORCE THIS CLAUSE AND, IF NECESSARY, TO ENJOIN THE MASS FILING OF ARBITRATION DEMANDS AGAINST VERIZON.
(7) AN ARBITRATION AWARD AND ANY JUDGMENT CONFIRMING IT APPLY ONLY TO THAT SPECIFIC CASE; IT CAN'T BE USED IN ANY OTHER CASE EXCEPT TO ENFORCE THE AWARD ITSELF.
(8) IF FOR SOME REASON THE PROHIBITION ON CLASS ARBITRATIONS SET FORTH IN SUBSECTION (3) CANNOT BE ENFORCED AS TO ALL OR PART OF A DISPUTE, THEN THE AGREEMENT TO ARBITRATE WILL NOT APPLY TO THAT DISPUTE OR PART OF THE DISPUTE.
CA-P.8

(9) IF FOR ANY REASON A CLAIM PROCEEDS IN COURT RATHER THAN THROUGH

ARBITRATION, YOU AND VERIZON AGREE THAT THERE WILL NOT BE A JURY TRIAL.

YOU AND VERIZON UNCONDITIONALLY WAIVE ANY RIGHT TO TRIAL BY JURY IN

ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO

THIS AGREEMENT IN ANY WAY. IN THE EVENT OF LITIGATION, THIS PARAGRAPH

MAY BE FILED TO SHOW A WRITTEN CONSENT TO A TRIAL BY THE COURT.

51

About this Agreement

If either you or we don't enforce our rights under this agreement in one instance, that doesn't mean you or we won't or can't enforce those rights in any other instance. You cannot assign this Agreement or any of your rights or duties under it without our permission. However, we may assign this Agreement or any debt you owe us without notifying you. If you're a Postpay customer, please note that many notices we send to you will show up as messages on your monthly bill. If you have online billing, those notices will be deemed received by you when your online bill is available for viewing. If you get a paper bill, those notices will be deemed received by you three days after we mail the bill to you. If we send other notices to you, they will be considered received immediately if we send them to your wireless device, or to any email or fax number you've given us, or after three days if we mail them to your billing address. If you need to send notices to us, please send them to the customer service address on your latest bill.

If you're a Prepaid customer and we send notices to you, they will be considered received immediately if we send them to your wireless device or to any email you've given us, or if we post them as a precall notification on your Service, or after three days if we mail them to the most current address we have for you. If you need to send notices to us, please send them to the Customer Service Prepaid address at verizon.com/contactus.

If any part of this agreement, including anything regarding the arbitration process (except for the prohibition on class arbitrations as explained in part 8 of the dispute resolution section above), is ruled invalid, that part may be removed from this agreement.

This agreement and the documents it incorporates form the entire agreement between us. You can't rely on any other documents, or on what's said by any Sales or Customer Service Representatives, and you have no other rights regarding Service or this agreement. This

52

Agreement isn't for the benefit of any third party except our parent companies, affiliates, subsidiaries, agents, and predecessors and successors in interest. Except where we've agreed otherwise elsewhere in this agreement, this agreement and any disputes covered by it are governed by federal law and the laws of the state encompassing the area code of your wireless phone number when you accepted this agreement, without regard to the conflicts of laws and rules of that state.

Updated October 20, 2021

34. As a. more or less, public utility, THE DEFENDANT bears a firm responsibility to the American populous for reliability..

35. At least with respect to THE PLAINTIFF, THE DEFENDANT has failed to fulfill that responsibility.

## VIOLATION OF PUBLIC TRUST

35. Cell phones are ubiquitous.

36. Citizens use them every minute of the day.

37. These same citizens trust that they can reliably achieve access to their friends, family, doctors, teachers, employees, employers, police, firefighters, FBI, CIA, homeland security, and countless others with whom they might need to communicateLon an urgent

53

basis.

38. By rendering this capability less than completely reliable, through its internal maneuvering, THE DEFENDANT has severely eroded the public trust, and deserves to be admonished, and soundly punished.

## VIOLATION OF PERSONAL TRUST

39. Like the citizens mentioned above, THE PLAINTIFF has become completely reliant on the cell phone for all of the purposes above, and more.

40. For example, THE PLEAINTIFF trusts that traffic in his city will flow efficiently. He trusts that refuse will be collected. He trusts that when he turns on a light switch, the lights will come on. He trusts that when he turns on the faucet, potable water will flow forth. He trusts that waste products will be disposed of in a manner that preserves public health.

41. On the day, and the occurrences of the day that make up the basis for this complaint, THE DEFENDANT failed in that public trust. THE PLAINTIFF was panic-stricken.

42. He felt as though he had been disconnected from the entire world (a sad

commentary)

43. Furthermore, THE PLAINTIFF was clueless as to what had happened, how to fix it or how long it would last.

44. THE PLAINTIFF remains a customer of THE DEFENDANT and is weary of another ATTEMPT (emphasis added) at a switch for fear of a repeat occurrence. He feels as though he is, economically speaking, being held hostage by THE DEFENDANT.

## INTENTIONAL INFLICTION OF
## EMOTIONAL PAIN AND SUFFERING

45. This claim has always bothered THE PLAINTIFF.

46. It is so ubiquitous in civil complaints that it might as well be boiler plate.

47. However, a closer examination of its content is instructive.

48. For example, nothing could be more absurd than to speculate that THE DEFENDANT (and by proxy, the first customer service representative with whom THE PLAINTIFF spoke) awoke the morning of the blessed event and said to herself "how much emotional pain and suffering can I cause for Steven Joffe today".

57

49. Equally as ridiculous would be to imagine that, upon entering the office, said representative tripped over the corner of an area rug, fell forward, and, protecting herself with her hands, accidently flipped a toggle switch rendering THE PLAINTIFF'S phone inoperative.

50. No. This representative, based upon information that she had (THE PLAINTIFF'S ATTEMPTED switch over to MINT MOBILE-again through technology not known to THE PLAINIFF) volitionally and purposely, personally, or more likely, through the actions of a technological assistant, rendered THE PLAINTIFF'S phone inactive.

51. As bad as the pain and suffering was on the day of the event, the pain and suffering continues, resulting in severe insomnia, excess consumption of alcohol and regular ingestion of clonazepam, well beyond the recommended dose. These are al bad things.

52 THE PLAINTIFF has actively sought access to out patient therapy settings to try to deal with the on going suffering. He has contacted no less than twenty organizations, all of whom either do not accept Medicare, or have full rosters. The Covid pandemic has exponentially increased the need for public emotional support.

53. Conclusion: INTIONAL INFICTION OF EMOTIONAL PAIN AND SUFFERING is a valid legal concept.

58

54. For this, and for all of the other transgressions noted, THE DEFENDANT deserves to be severely punished.

## DAMAGES

54. For VIOLATION OF PUBLIC TRUST, THE PLAINTIFF DEMANDS $50,000 in punitive damages. For VIOLATION OF PERSONAL TRUST, THE PLAINTIFF demands $50,000 in punitive damages. For posing a THREAT TO NATIONAL SECURITY, THE PLAINTIFF demands $50,000 in punitive damages.. For posing a THREAT TO PERSONAL SECURITY, THE PLAINTIFF demands $50,000 in punitive damages. For INTENTIONAL INFLICTION OF EMOTIONAL PAIN AND SUFFERING upon THE PLAINTIFF, THE PLAINTIFF DEMANDS $50,000 in punitive damages, and any other damages THIS COURT seems fit to award.

Respectfully submitted,

Steven L. Jones, M.D.

59

**SUMMARY**

55.  This action illustrates how a large, multinational corporation can seriously influence the life of a single customer.  Not only did the corporation's representative misquote the company's policy, but, based upon that false information, took swift and decisive action against that customer, causing, not only acute severe suffering and damage, but ongoing distress.. THE PLAINTIFF has laid out, in excruciating detail, the critical importance of a wireless company's responsibility to provide reliable service. Verizon has failed in that responsibility, resulting in great harm.  A verdict in favor of THE PLAINTIFF would serve as a wakeup call to Verizon to insure that their employees are better informed as to company policy, and to act accordingly.

60

## CERTIFICATE OF SERVICE

I, Steven L. Joffe,.M D, do, hereby certify that on December 20, 2021, I served, by

United States Postal Service, Registered, Return Receipt Requested, an accurate copy of

the civil complaint entitled **STEVEN L. JOFFE, M. D, v. VERIZON WIRELESS**

**INC, AND RONAN DUNN, VERIZON VSAT (VERIZON SECURITY ASSISTANCE**

**TEAM), 180 WASHINGTON VALLEY ROAD, BEDMINSTER, NJ 07921,** the

registered agent for process service for **VERIZON WIRELESS INC.**

Steven L. Joffe, M. D

60